901 P.2d 708

**STATE of New Mexico,
Plaintiff–Appellee,**

v.

**John J. FEKETE, Defendant–Appellant.**

**No. 21973.**

Supreme Court of New Mexico.

July 17, 1995.

Sammy J. Quintana, Chief Public Defender, Susan Gibbs, Assistant Public Defender, Santa Fe, for appellant.

Tom Udall, Attorney General, Gail Mac-Questen, Assistant Attorney General, Santa Fe, for appellee.

## OPINION

MINZNER, Justice.

This is a first degree murder case in which Defendant John J. Fekete appeals the judgment and life sentence the district court entered after the jury reached a verdict of guilty but mentally ill. Fekete raises the following issues on appeal: (1) whether substantial evidence supports the element of deliberate intent for first degree murder; (2) whether the trial court erred in refusing to give his tendered jury instruction on diminished capacity; (3) whether the trial court erred in denying his motion to suppress various statements made to police officers; and (4) whether the verdict of guilty but mentally ill deprived him of his rights to due process and a fair trial. Each of the issues raised on appeal requires a review of traditional principles in light of a special factor: Fekete's undisputed, longstanding mental illness. We affirm.

## FACTS

Fekete has a twenty-year history of paranoid schizophrenia; he has been in and out of psychiatric facilities for most of his adult life. Expert testimony at trial established that his psychotic symptoms are controlled by Haldol, a psychotropic medication. The Haldol injections control his psychotic symptoms for several weeks.

On February 5, 1992, Fekete was removed from a Silver City transitional living center by the police. He had been at the center for several weeks since his release from a mental health facility where he had last received his antipsychotic medication. The center contacted the police because he had begun to exhibit acute psychotic symptoms that the center was not equipped to control.

The shooting occurred February 6. The following description of the shooting and prior events are derived from the evidence presented at trial, which included a tape-recorded statement Fekete gave to the police after the shooting, as well as testimony by the State's psychological expert, to whom Fekete gave a similar description of the shooting and prior events.

Fekete remained in Silver City after he was removed from the transitional living center. He rented a motel room on February 6, 1992. That same day, he went to a local pawn shop to inquire about purchasing a gun. He did not purchase a weapon at that time because he did not have enough money. Later that day, after cashing a disability check, he returned to the pawn shop and bought the gun. He next went to K–Mart to purchase ammunition and, because he thought the price at K–Mart was too high, he then went to Wal–Mart. After he purchased ammunition at Wal–Mart, he went to an area he described as "the woods" and loaded the gun. He put the gun in his belt and walked back to his motel room.

That evening Fekete visited the home of a married friend from whom he thought he could obtain marijuana. The friend did not have any marijuana and told Fekete to come back the next day. In an interview with the State's psychological expert, Fekete stated that he was angry and frustrated after visiting his friend because his friend had a happy family life and he did not.

After leaving his friend's house, Fekete went to a convenience store where he purchased candy. He then walked through the downtown streets "searching for someone to shoot." In his statement to the police, he said that it did not matter who he shot, but that he preferred to shoot a man because of the way he had been "treated and blasphemed." He wandered by a ballet studio where he saw women through a window and thought about shooting one of them, but rejected the thought.

Fekete continued down the street and saw a couple walking together. Although the couple was in fact middle-aged, he mistakenly saw the couple as "an old man and a very young girl." He thought the man was "probably having intercourse with that girl." Fekete reported that as the couple walked toward him, he thought "do it now." According to his statement to the police, he took off the gun's safety catch while the gun was still in his pocket, pulled out the gun, and shot the victim twice very quickly. He stated that the gun would not fire the second time, so he ejected the shell and put in another one. He also stated that he thought about shooting the woman who was with the victim, but decided against it.

After the victim collapsed from the shooting, Fekete quickly walked away in order not to be seen and eventually ended up back at his motel room. There he reloaded his gun because he "had plans." He thought about killing more people, but decided against it. He remained in his motel room until the next day.

In response to police questioning about his deliberation, Fekete responded that he did not think about killing the victim in advance. Rather, he saw the couple and thought "do it." He stated that he had no forethought; he just reacted. He was acquainted with the victim, Greg Jaurequi, but did not recognize Jaurequi as the man he shot. When the police informed Fekete of the victim's identity, he was surprised.

Based on information obtained from the pawn shop where Fekete purchased the gun, the police went to his motel the day after the shooting. When the police approached him, they asked him to accompany them to the station for questioning, and he stated to them that he "shot that old man downtown last night." He asked the officers if they wanted the gun, gesturing to his coat. One officer took the gun and asked where he got it. Fekete's answer was non-responsive. He handed the officers extra ammunition he was carrying and other personal items and entered the police van. One of the officers, Sergeant Ruiz, had his tape recorder running most of the short journey to the police station. During that journey Fekete repeated twice that he had shot the "guy" downtown the prior night. After a period of silence, interrupted by police radio broadcasts, he asked a question: "What about that old man last night, man. Did he live?" Sergeant Ruiz responded to the question by asking "which one?" Fekete began to make other incriminating statements; he reported he had shot "the old man ... point blank." Sergeant Ruiz was silent, but another officer noted the presence of the tape recorder. Fekete then said, "Don't record ... enough of that." At the police station he signed a written waiver of his *Miranda* rights and

made a detailed statement that described his activities and the shootings.

The district court initially found Fekete incompetent to stand trial. He was admitted to the Las Vegas State Hospital and treated with medication for almost a year. Subsequently the district court found him competent to stand trial, and he entered a plea of not guilty by reason of insanity. At trial, experts for both the State and the defense testified regarding Fekete's sanity. Dr. Natalicio, the defense expert, testified that Fekete was insane at the time of the shooting and was incapable of forming the deliberate intent to kill. The State's expert, Dr. Foote, testified that Fekete was not insane at the time of the shooting. Although unwilling to give a formal opinion on the issue of whether Fekete had the ability to form the requisite intent to kill, Dr. Foote did testify that he thought Fekete was not actively psychotic at the time of the shooting. Dr. Foote based this assessment on Fekete's ability to purchase the gun and ammunition, to avoid detection after the shooting, and to describe his acts the next day to the police. He also said that in his opinion, Fekete could have controlled or restrained himself from the act of killing. He testified that the offense "came out of a rational place" in Fekete; Dr. Foote testified that it occurred during a "period of rational thinking." He outlined the evidence that in his judgment would support a finding of deliberate intent and indicated that the evidence pointing the other way was Fekete's anger. "[B]eing very angry can sometimes interfere with a person's capacity to form intent."

Among other instructions, the jury was instructed on both premeditated, deliberate first degree murder and second degree murder. The jury was given both the verdict of not guilty by reason of insanity and the verdict of guilty but mentally ill. The jury found Fekete guilty but mentally ill. As required by NMSA 1978, Section 31–18–14(A) (Repl.Pamp.1994), he was sentenced to life imprisonment.

**EVIDENCE OF DELIBERATE INTENT**

Fekete's argument on this issue is two-fold. First, he argues that the State failed to establish beyond a reasonable doubt that he had the deliberate intent to kill the victim. *See* NMSA 1978, § 30–2–1(A)(1) (Repl. Pamp.1994) (first degree murder includes "any kind of willful, deliberate and premeditated killing"). Second, he argues that it was error for the trial court to include the phrase "or any other human being" in the first degree murder jury instruction because the facts do not support a finding of transferred intent killing.

**A. Sufficiency of the Evidence of Deliberate Intent**

To support his claim that the State failed to establish the element of deliberate intent beyond a reasonable doubt, Fekete relies primarily on *State v. Garcia,* 114 N.M. 269, 837 P.2d 862 (1992). In *Garcia,* this Court reversed a first degree murder conviction because there was insufficient evidence to support a finding of "deliberate intent," a requisite element under New Mexico's first degree murder statute. *Id.* at 274–75, 837 P.2d at 867–68. As we stated in *Garcia,* a deliberate killing is one in which the slayer weighs and considers "the question of killing and his reasons for and against such a choice." *Id.* at 271, 837 P.2d at 864 (*quoting* SCRA 1986, 14–201). We determined that there was "*no* evidence to support the jury's conclusion that ... Garcia decided to stab [the victim] as a result of careful thought; that he weighed the considerations for and against his proposed course of action; and that he weighed and considered the question of killing and his reasons for and against this choice." *Id.* at 274, 837 P.2d at 867. We concluded that, while it was rational for the jury to determine that the defendant's act was intentional, because there was no evidence to support the jury's determination that the defendant deliberated with careful thought prior to the killing, the conviction for deliberate murder could not stand. We stated that while there was evidence that the defendant had time to deliberate killing the victim, there was no evidence that he did so. *Id.* at 275, 837 P.2d at 868.

Fekete contends that his mental illness precluded him from forming the deliberate intent to kill the victim. The jury heard conflicting expert testimony on the effect of

paranoid schizophrenia on Fekete's ability to form deliberate intent and resolved that issue against him. Although Dr. Foote declined to give a formal opinion on Fekete's capacity to form a deliberate intent, Dr. Foote's testimony supports a finding that Fekete had that capacity. We conclude that substantial evidence supports the jury's implicit finding of capacity.

In addition, Fekete contends that his failure to focus on a specific victim until the last few moments before the shooting conclusively shows that he did not have deliberate intent to kill that particular victim. In this case, unlike *Garcia*, we are persuaded that there is sufficient evidence to support the jury's finding of deliberation. Fekete selected his victim, thought about his proposed *course of action prior to and during* the shooting, and then thought about the consequences of his act. Specifically, in his statement to the police after the shooting, he recounted an elaborate plan that involved purchasing a firearm, contemplating whom to kill, preferably a male, and then wandering through the streets searching for, and choosing, a specific victim. According to the record, Fekete wanted to shoot "someone," thought about shooting "the girl" in the dance studio, decided against it, saw the victim, unlocked the safety of the gun in his pocket, and then shot the victim point blank after he pulled the gun out of his pocket. Although some of his statements to the police indicate that he did not contemplate shooting the victim until he saw him, other statements indicate that he had formed his intent to shoot someone and then looked for an appropriate person. The jury had sufficient evidence to determine that Fekete weighed and considered whether to kill the victim. The jury considered his description of his thought process, in addition to all the other evidence. The credibility and weight to be given his statements were jury questions. *State v. Jett*, 111 N.M. 309, 314, 805 P.2d 78, 83 (1991) (stating that the "jury was entitled to weigh the evidence and assess the credibility of the witnesses").

The issue of whether Fekete had a deliberate intent to kill is particularly troublesome because the primary evidence of intent is derived from Fekete's own statements to the police. The reliability of these statements is brought into question by his undisputed mental illness. We are cognizant of the fact that without Fekete's statements, the case for first degree murder comes close to *Garcia*. Absent his statements to the police, the evidence for first degree deliberate intent murder is largely circumstantial and inferential. *See State v. Motes*, 118 N.M. 727, 729, 885 P.2d 648, 650 (1994). However, "circumstantial evidence is sufficient to uphold a first-degree murder conviction." *Id.* We address separately Fekete's arguments that the trial court erred in admitting his various statements to the police. Considering all the facts available to the jury, including Fekete's statements, we conclude that substantial evidence supports the jury's finding of deliberate intent. We next turn to Fekete's argument that the jury instruction was erroneous because the jury was not required to determine that he deliberately planned to kill Jaurequi.

## B. The Jury Instruction on Transferred Intent

Fekete's next contention is that the trial court erred by including the language "or any other human being" in the jury instruction on deliberate intent murder. However, this contention asks us to determine that the instruction given, which became the law of the case, was not appropriate, either because it was not supported by the evidence in this case or because it misinformed the jury as it considered the evidence. We hold that it was not error for the trial court to include the phrase "or any other human being" in the deliberate intent murder instruction.

The jury instruction provided, in pertinent part, that "[t]he killing was with the deliberate intention to take away the life of Greg Jaurequi or any other human being." Fekete contends that the phrase "or any other human being" is error since that language is normally utilized when the prosecution relies on the doctrine of transferred intent to establish an accused's culpability. He refers to Use Note 2 accompanying SCRA 14–201, which provides that the optional language "or any other human being" is to be used "if the

evidence shows that the defendant had a deliberate design to kill someone but not necessarily the victim." He additionally points to the Committee Commentary that follows the Use Note and explains that the "or any other human being" language should be used when the State has charged, and there is evidence to support, a transferred intent theory of first degree murder. Fekete urges this Court to hold that the optional language may only be given in those cases where there is evidence to support a theory of transferred intent, and to hold that in first degree murder cases, the jury must find that a defendant deliberately intended to kill a specific person.

■ The doctrine of transferred intent is a legal fiction that is used to hold a defendant criminally liable to the full extent of his or her criminal culpability. *People v. Czahara*, 203 Cal.App.3d 1468, 250 Cal.Rptr. 836, 839 (1988). Traditionally, the transferred intent theory has been applied in so-called "bad aim" situations where a defendant, while intending to kill one person, accidentally kills an innocent bystander or another unintended victim. *State v. Wilson*, 71 Wash.App. 880, 863 P.2d 116, 121 (1993) ("The doctrine of transferred intent was created to avoid the specific intent requirement and thus hold the defendant accountable for the consequences of his behavior when he injures an unintended victim."), *rev'd in part*, 125 Wash.2d 212, 883 P.2d 320 (1994) (en banc). When a criminal statute "matches specific intent with a specific victim," the doctrine of transferred intent protects an unintended victim. *See State v. Wilson*, 125 Wash.2d 212, 883 P.2d 320, 324 (1994) (en banc). Thus, the perpetrator's intent to kill or injure a specific victim transfers to the unintended victim. *State v. Ochoa*, 61 N.M. 225, 227, 297 P.2d 1053, 1054 (1956).

■ One commentator suggests that while the doctrine of transferred intent is most often utilized in "bad-aim" cases, this limitation is factual rather than theoretical. Paul H. Robinson, *Imputed Criminal Liability*, 93 Yale L.J. 609, 619 (1984). The purpose of the doctrine is to impose criminal liability upon an actor when he or she intends to commit a criminal act, and "the actual result

differs from the result designed or contemplated only in that a different person or property was injured or affected." *Model Penal Code* § 2.03(2)(a) cmt. 3 (1985). Thus, when all of the elements of an offense are met, with the exception that the victim differs from the one the perpetrator intended to harm, criminal liability should be imposed. *Id.*

It has been suggested that the need for the doctrine of transferred intent may be completely avoided by defining the offense of homicide as intending "to cause the death of that person *or of another* person." 1 Paul H. Robinson, *Criminal Law Defenses* § 89(c) (1984) (paraphrasing Ala.Code § 13A–6–2(a)(1) (1982)). New Mexico's statute addresses this concern by defining homicide as the "killing of one human being by another." Section 30–2–1(A); *see also Wilson*, 883 P.2d at 323 (discussing crime of assault in the first degree under Washington statute as requiring a specific intent but not, under all circumstances, requiring "that the specific intent match a specific victim").

We have determined there was sufficient evidence to support the jury's determination that Fekete had the deliberate intent to kill Jaurequi. We agree with Fekete that this case does not involve what is traditionally known as "transferred intent." *See Miles v. State*, 88 Md.App. 248, 594 A.2d 634, 639 (holding that transferred intent does not apply when there is no "unintended victim"), *certs. denied*, 325 Md. 94, 95, 599 A.2d 447 (1991). We next address whether the trial court erred in giving the jury an instruction that is used most often in transferred intent cases.

■ A jury instruction, when viewed individually, may appear defective. *State v. Parish*, 118 N.M. 39, 41, 878 P.2d 988, 990 (1994). However, in some instances a jury instruction that initially appears defective may, in the context of the other instructions given, accurately explain and describe the applicable law. *Id.* Our review of SCRA 14–201, the Use Note, and the Committee Commentary indicates that the optional language is to be used primarily in cases involving transferred intent. However, we decline

to absolutely limit the inclusion of this language to those situations. To do so would bar the trial court from determining that an instruction may, when viewed in the context of other instructions in their entirety, provide guidance to the jury. *See Parish,* 118 N.M. at 42, 878 P.2d at 991 ("[I]f a jury instruction is capable of more than one interpretation, then the court must next evaluate whether another part of the jury instructions satisfactorily cures the ambiguity.").

We believe that in rare circumstances, such as those presented by this case, the phrase "or any other human being" may assist the jury. Here, Fekete claimed at trial that his plan to kill "someone" did not constitute evidence that he intended to kill Jaurequi. Such a position is contradictory to New Mexico's deliberate intent murder statute, which provides that first degree murder is the "killing of one human being by another." *See* § 30–2–1(A). *Cf.* 1 Wayne R. La-Fave & Austin W. Scott, Jr., *Substantive Criminal Law* § 3.12(d) n. 46 (1986) ("Sometimes a statutory crime may be worded in such a way as to require for guilt that the intended victim and the actual victim be one and the same—e.g., 'whoever with a deadly weapon commits a battery on another with intent to kill or maim *such person* is punishable … [.]' "). In this case, Fekete's position at trial was that his elaborate plan to kill "someone" did not constitute evidence of his intent to kill Jaurequi, the specific victim killed. In this case, the explanatory language contained in the jury instruction helped to ˙clarify the first. degree murder statute for the jury. When considered as a whole, the inclusion of the "or any other human being" language was not error.

There may be instances when it would be reversible error to include the transferred intent language in a deliberate intent murder instruction. *See Parish,* 118 N.M. at 41, 878 P.2d at 990 (stating that a facially erroneous instruction "presents an incurable problem and mandates reversal"). For instance, when the criminal statute that forms the basis for an accused's criminal liability specifies the victim's identity, an instruction on transferred intent would mislead the jury. In *United States v. Montoya,* 739 F.2d 1437, 1438 (9th Cir.1984), the Court reversed an assault conviction because the federal statute under which the defendant was charged and convicted applied only when the victim was a federal officer. The *Montoya* Court held that Congress's purpose in enacting the statute was to severely punish assaults against federal officers, and punishing a perpetrator for an assault that per chance involved a federal officer went beyond the meaning of the legislative intent. *Id.* Because our first degree murder statute is not specific regarding the identity of the victim, this case does not present similar concerns.

## JURY INSTRUCTION ON DIMINISHED CAPACITY

Fekete argues that the trial court erred in denying his requested instruction on diminished capacity. We disagree that the trial court made any error in refusing his tendered instruction.

■ A defendant is entitled to have the jury instructed on his or her theory of the case. *Reese v. State,* 106 N.M. 498, 501, 745 P.2d 1146, 1149 (1987). However, it is not error for the trial court to refuse a tendered instruction when the instructions given to the jury adequately cover the law. *State v. Isiah,* 109 N.M. 21, 31–32, 781 P.2d 293, 303–04 (1989), *overruled on other grounds, State v. Lucero,* 116 N.M. 450, 453–54, 863 P.2d 1071, 1074–75 (1993).

Fekete requested the following instruction:

Evidence has been presented that the defendant was withdrawing from the use of Haldol, a psychotropic medication and/or suffering from Paranoid Schizophrenia. You must determine whether or not the defendant was withdrawing from the use of Haldol, a psychotropic medication and/or suffering from paranoid schizophrenia, and if so what effect this had on the defendant's ability to form the deliberate intention to take away the life of another.

*If the defendant was not capable of forming a deliberate intention to take the life of another, you must find him not guilty of a first degree murder by deliberate killing.* The deliberate intention to take away the life of another required for a first degree murder by deliberate killing is

not an element of Murder in the Second Degree. If you find the defendant not guilty of first degree murder by deliberate killing, you must proceed to determine whether or not he is guilty of Murder in the Second Degree. (Emphasis added.)

The trial court refined the tendered instruction and gave the following, derived from SCRA 1986, 14–5110:

Evidence has been presented that the defendant was suffering from a mental disease or disorder. You must determine whether or not the defendant was suffering from a mental disease or disorder, and if so, what effect this had on the defendant's ability to form the deliberate intention to take away the life of another.

If the defendant was not capable of forming a deliberate intention to take the life of another, you must find him not guilty of a first degree murder by deliberate killing. The deliberate intention to take away the life of another required for a first degree murder by deliberate killing is not an element of second degree murder. If you find the defendant not guilty of first degree murder by deliberate killing, you must proceed to determine whether or not he is guilty of second degree murder.

■ The instruction given adequately informed the jury of the applicable law. Fekete's theory at trial was that he was insane at the time of the killing and, because of his mental illness, was unable to form the deliberate intent to kill the victim. His expert testified that his voluntary withdrawal from Haldol contributed to his inability to form intent. The above-listed instruction adequately informed the jury of his theory, and the trial court did not err in refusing to give his tendered instruction. *Isiah*, 109 N.M. at 32, 781 P.2d at 294.

## SUPPRESSION OF FEKETE'S STATEMENTS

Fekete contends that the trial court erred in denying his motion to suppress statements and a confession that he gave to the police. First, he argues that he was unable to give any type of voluntary statement to the police because he was mentally incompetent at the time the statements were made. He argues that in giving a confession when he was mentally unstable, his constitutional right to due process under the Fourteenth Amendment was violated. Second, he argues that his statements to police were made in violation of his Fifth Amendment *Miranda* rights. We discuss the two claims separately. A claim that the police coerced a statement requires a different analysis than a claim that an accused voluntarily waived his or her Fifth Amendment protections under *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). *See generally Miller v. Dugger*, 838 F.2d 1530, 1535–40 (11th Cir.) (comparing the Fourteenth Amendment due process analysis to be applied, when the only issue is whether a defendant's statement is voluntary as required by federal due process principles, and the analysis to be applied when there is also an issue whether a defendant has waived his or her privilege against self-incrimination and right to retained or appointed counsel), *cert. denied*, 486 U.S. 1061, 108 S.Ct. 2832, 100 L.Ed.2d 933 (1988). We first address Fekete's due process argument.

### A. Fekete's Due Process Right and the Voluntariness of His Statement

■ The prosecution has the burden of proving the voluntariness of a defendant's statement by a preponderance of the evidence. *Aguilar v. State*, 106 N.M. 798, 800, 751 P.2d 178, 180 (1988). On appeal, when determining whether a confession is voluntary, we review the entire record and the circumstances under which the statement or confession was made in order to make an independent determination of whether a defendant's confession was voluntary. *Id.* at 799, 751 P.2d at 179. In doing so, we examine the "totality of the circumstances" surrounding the confession in order to decide the ultimate question of voluntariness. *Id.; see also Culombe v. Connecticut*, 367 U.S. 568, 606, 81 S.Ct. 1860, 1881, 6 L.Ed.2d 1037 (1961). In *Aguilar*, we determined that a police officer improperly influenced the defendant's confession by offering the defendant leniency and by taking advantage of the fact that the defendant was mentally retarded. Thus, we determined that under the

totality of circumstances, the defendant's confession had been coerced. Our inquiry in this case, as it was in *Aguilar*, is to determine as a threshold matter whether the confession was involuntary as a matter of law. *Cf.* SCRA 1986, 14–5040 use note 1 (jury instructed on voluntariness after trial court has first made determination that accused's statements were voluntary).

▮▮▮ In *Colorado v. Connelly*, 479 U.S. 157, 107 S.Ct. 515, 93 L.Ed.2d 473 (1986), the United States Supreme Court held that coercive police conduct is a necessary predicate to a finding that a confession is not "voluntary" within the meaning of the Due Process Clause of the Fourteenth Amendment. *Id.*, 479 U.S. at 164, 107 S.Ct. at 520. The Court stated that without police misconduct, there is "no basis for concluding that any state actor has deprived a criminal defendant of due process of law." *Id.* We have referred to *Connelly* in *Aguilar* and other cases, but prior to this we have not had an occasion to directly apply its rationale. *See State v. Franks*, 119 N.M. 174, 178–79, 889 P.2d 209, 213–14 (Ct.App.1994) (discussing application of *Connelly* and *Aguilar*). In this case, we do so. We recognize that under the totality of circumstances test, a confession is not involuntary solely because of a defendant's mental state. Instead, the totality of circumstances test includes an element of police overreaching.

Fekete contends that under the test of *State v. Sisneros*, 79 N.M. 600, 605, 446 P.2d 875, 880 (1968), his confession should have been suppressed. According to *Sisneros*, a confession is constitutionally valid when a defendant is conscious of his or her acts, is able to retain memory of his or her actions, and can "relate with reasonable accuracy the details of his [or her] actions." *Id.* Fekete argues that because he was suffering from delusions caused by paranoid schizophrenia, he was incompetent to make any statements. The State contends that Fekete's actions at the time of his statements to the police meet the criteria of *Sisneros* because he was conscious of his acts and was able to accurately relate the details of his actions.

▮▮▮ We take this opportunity to clarify the relationship between the "mental compe-

tency" test of *Sisneros* and the totality of the circumstances test of *Aguilar*. While *Sisneros* refers to the totality of circumstances test, the opinion focuses primarily on a mental competency test to make a threshold determination of voluntariness. The mental competency test of *Sisneros* is only one element to consider when determining voluntariness under the totality of the circumstances test. Thus, rather than a threshold requirement, a defendant's mental state at the time he or she makes incriminating statements to the police is only one factor for the trial court to consider when determining whether such statements were voluntary. This view follows the reasoning of *Connelly*, in which the Supreme Court stated that a defendant's mental state is one factor for the trial court to consider when determining a statement's voluntariness. *Connelly*, 479 U.S. at 167–68, 107 S.Ct. at 522.

▮▮▮ Applying the totality of circumstances test in this case, we are not persuaded that Fekete's statements to the police were involuntary within the meaning of the Due Process Clause of the Fourteenth Amendment. Specifically, our review of his statements to the police indicates that although Fekete suffers from mental illness, he was able to describe in detail his activities prior to, during, and after the shooting. In addition, the record does not indicate that he was personally mistreated in terms of lengthy or abusive questioning by the police. Also, the record does not support any finding of overreaching by the police. The officers questioning Fekete did not threaten or coerce him, nor did they promise him any special treatment if he talked to them. Fekete's contention that the officers' knowledge of his mental disease alone constitutes police overreaching is unpersuasive in light of *Connelly*, in which the Supreme Court noted that a defendant's mental state is only one factor to consider in determining voluntariness.

This case is also distinct from *Aguilar*. Fekete is correct that the officer in *Aguilar* was aware of the defendant's mental defects and utilized that knowledge in coercing a confession from the defendant. *Aguilar*, 106 N.M. at 800, 751 P.2d at 180. However, our

determination that the defendant's statements were involuntary was not solely based on the officer's knowledge of the defendant's mental defects. In addition to exploiting the defendant's mental disabilities, the police officer in *Aguilar* also promised him leniency if he confessed. *Id.* There is no evidence in this record to support a finding of police misconduct. We conclude that, in making statements to the police officers, Fekete was not deprived of due process of law, and the trial court properly denied his motion to suppress his statements on that ground.

## B. Fekete's Fifth Amendment Rights and the Evidence of Waiver

We now turn to Fekete's Fifth Amendment claims under *Miranda.* Fekete made statements to police officers when they first approached him at the motel, again when the officers transported him to the police station, and finally when he was questioned by Captain Hall at the station. Each set of statements requires a different analysis.

■ Suppression of an accused's statements made to a law enforcement officer prior to the giving of *Miranda* warnings is only required when the statements are the product of a custodial interrogation. *State v. Chamberlain,* 112 N.M. 723, 728, 819 P.2d 673, 678 (1991). "The relevant inquiry to determine whether an individual is in police custody is 'how a reasonable man in the suspect's position would have understood his situation.'" *Id.* .(quoting *Berkemer v. McCarty,* 468 U.S. 420, 442, 104 S.Ct. 3138, 3151, 82 L.Ed.2d 317 (1984)). "Interrogation occurs when an officer subjects an individual to questioning or circumstances which the officer knows or should know are reasonably likely to elicit incriminating responses." *State v. Cavanaugh,* 116 N.M. 826, 828, 867 P.2d 1208, 1210 (Ct.App.1993), *cert. denied,* 117 N.M. 121, 869 P.2d 820 (1994). The threshold inquiry when a defendant alleges a violation of *Miranda* rights is whether there was an interrogation. *State v. Ybarra,* 111 N.M. 234, 236, 804 P.2d 1053, 1055 (1990).

■ When the officers arrived at the motel and told Fekete they wanted to speak with him, he responded that he "shot that old man downtown last night," and asked if the

officers wanted the gun. At the time he made these statements, he was not in police custody. Instead, the police had only stated that they wanted to talk to him. General questioning of citizens is not considered to be custodial interrogation. *State v. Swise,* 100 N.M. 256, 257, 669 P.2d 732, 733 (1983). The officers' request to talk to Fekete did not rise to the level of taking him into custody. Since Fekete was not in custody at the time the statements were made, they were properly admitted into evidence.

■ Fekete next made statements to the police while the officers transported him to the police station. Although the officers asked him to come to the police station for questioning, they did not advise him of his *Miranda* rights prior to asking him to accompany them. We assume that Fekete was in custody during the ride to the police station. However, even when an accused is in custody, *Miranda* protections do not apply in those situations where he or she volunteers statements. *State v. Greene,* 91 N.M. 207, 214, 572 P.2d 935, 942 (1977).

■ Volunteered statements come within one of two categories: statements which the police did not attempt to elicit, and statements made during custodial interrogation that may be in response to police questioning but are unresponsive to the questions asked. *State v. Pisio,* 119 N.M. 252, 257, 889 P.2d 860, 865 (Ct.App.1994) (quoting 3 William E. Ringel, *Searches and Seizures, Arrests and Confessions* § 27.4(a), at 27–26.6 (2d ed. 1994)), *certs. denied,* 118 N.M. 20, 888 P.2d 466 (1995). The second type of statement is one that police officers cannot foresee because it is too far removed from the questions asked. *Id.* Thus, because there is an absence of police misconduct, such statements need not be suppressed.

■ The record indicates that all but one of Fekete's statements while en route to the station were spontaneous and not in response to any conversation with or questioning by the police. The statements repeated what he had said before entering the police van. One of the officers did respond to Fekete's question about whether "the old man" had lived. The officer answered his question with an-

other question by asking "which one." In response, Fekete initially repeated his prior statements that he had shot an "old man." The balance of his comments at this point were non-responsive to the officer's question. He said: "Guess I wasn't a very good shot, man. I shot point blank, man. The fucker wouldn't go down."

■ Even if the officer's question to Fekete was custodial interrogation, his direct response to the question was harmless error because he only repeated his earlier statements. The balance of Fekete's comments made after his initial response to the officer's question were non-responsive, but given the tenor of his prior statements, were probably foreseeable by the officers. Fekete's later statement to Captain Hall at the police station, however, provided essentially the same information as the comments he made in the journey to the station. Thus, if Fekete's statement to Captain Hall was given after a voluntary waiver of Fifth Amendment rights, any error caused by the admission of his statements made in the police vehicle was harmless.

We now address the detailed statements Fekete made to Captain Hall after Fekete was advised of and waived his *Miranda* rights. Fekete contends that he was incapable of waiving his *Miranda* rights because of his mental illness.

■ In order for a defendant's waiver of *Miranda* rights to be constitutionally valid, the wavier must be knowingly and intelligently made. *State v. Young,* 117 N.M. 688, 691, 875 P.2d 1119, 1122 (Ct.App.), *certs. denied,* 117 N.M. 773, 877 P.2d 579 (1994). "Whether 'voluntary' is examined in the context of the Fifth Amendment (waiver) or the Fourteenth Amendment (due process), the benchmark is the absence of governmental coercion or police overreaching." *Pisio,* 119 N.M. at 257, 889 P.2d at 865 (citing *Franks,* 119 N.M. at 178–79, 889 P.2d at 213–14, in analyzing a Fifth Amendment Claim). The prosecution bears the burden of showing by a preponderance of the evidence that a defendant's waiver was knowing and intelligent. *State v. Boeglin,* 100 N.M. 127, 130–31, 666 P.2d 1274, 1277–78 (Ct.App.1983) (quoting *State v. Greene,* 92 N.M. 347, 350, 588 P.2d 548, 551 (1978)).

The inquiry whether an accused has voluntarily, knowingly, and intelligently waived his *Miranda* rights has "two distinct dimensions." *Moran v. Burbine,* 475 U.S. 412, 421, 106 S.Ct. 1135, 1141, 89 L.Ed.2d 410 (1986).

First, the relinquishment of the right must have been voluntary in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion, or deception. Second, the waiver must have been made with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it.

*Id.*

■ The trial court ruled that Fekete's waiver of his *Miranda* rights was knowingly and intelligently made. As stated above, the record contains no evidence that police overreaching contributed to Fekete's voluntary confession. Similarly, we do not find any evidence in the record indicating that the police intimidated or coerced him into waiving his *Miranda* rights. Thus, our inquiry focuses on the second element of the waiver: i.e., whether Fekete was fully aware both of the nature of the rights he waived and the consequences of the waiver. We conclude that the record supports a determination that he was aware of his *Miranda* rights and the consequences of waiving those rights.

Captain Hall reviewed the waiver of rights form with Fekete, asked him to read each item contained in the form, and then asked him if he understood each item. Fekete was able to repeat the information to Captain Hall and explain the meaning of the items contained on the form. At the suppression hearing, experts for both the defense and the prosecution testified regarding Fekete's mental capacity to make statements and to understand his constitutional rights. While the evidence was conflicting, the State's expert testified that Fekete was mentally competent to make voluntary statements and to understand his constitutional rights. Thus, although Fekete has a mental disease, there is evidence in the record to support the fact that he understood the meaning and consequences of his actions. *See Morris v. State,* 766 P.2d 1388, 1392 (Okla.Crim.App.1988) ("While the testimony concerning the degree

**302**

of appellant's mental impairment was conflicting, there was sufficient evidence that he could understand and appreciate the rights which he waived."). We conclude that the trial court properly denied Fekete's Fifth Amendment claims based on *Miranda*. *Cf. People v. May*, 859 P.2d 879, 883 (Colo.1993) (en banc) (district court findings properly focussed on the defendant's ability to comprehend the situation rather than on any incidence of police misconduct; even though the court's ruling was couched in terms of voluntariness, the defendant's ability to comprehend what was happening was primary factor).

### GUILTY BUT MENTALLY ILL VERDICT

Fekete finally contends that it was error for the trial court to instruct the jury on the "guilty but mentally ill" verdict. *See* SCRA 1986, 14–5101 ("not guilty by reason of insanity" and "guilty but mentally ill" jury instructions). Specifically, he contends that the jury should have been instructed on the differences between a verdict of "not guilty by reason of insanity" and the verdict of "guilty but mentally ill." *See generally State v. Neely*, 112 N.M. 702, 704–10, 819 P.2d 249, 251–57 (1991).

Fekete concedes in his brief that he did not object to the jury instruction on the guilty but mentally ill theory. In addition, our review of the record indicates that he did not request a jury instruction on the differences between the two verdicts. *See* SCRA 1986, 5–608(D) (Repl.Pamp.1992) ("[F]or the preservation of error in the charge, objection to any instruction given must be sufficient to alert the mind of the court ... or, in case of failure to instruct on any issue, a correct written instruction must be tendered before the jury is instructed."). Therefore, Fekete failed to preserve the issue for appellate review, and we do not address it.

### CONCLUSION

The judgment and sentence are affirmed.

**IT IS SO ORDERED.**

FRANCHINI and FROST, JJ., concur.