This memorandum opinion was not selected for publication in the New Mexico Reports. Please see Rule 12-405 NMRA for restrictions on the citation of unpublished memorandum opinions. Please also note that this electronic memorandum opinion may contain computer-generated errors or other deviations from the official paper version filed by the Court of Appeals and does not include the filing date.

**IN THE COURT OF APPEALS OF THE STATE OF NEW MEXICO**

**STATE OF NEW MEXICO,**

    Plaintiff-Appellee,

v.  **No. 28,863**

**JERRY CASTILLO,**

    Defendant-Appellant.

**APPEAL FROM THE DISTRICT COURT OF BERNALILLO COUNTY**
**Albert S. "Pat" Murdoch, District Judge**

Gary K. King, Attorney General
Santa Fe, NM
Francine A. Chavez, Assistant Attorney General
Albuquerque, NM

for Appellee

Hugh W. Dangler, Chief Public Defender
Karl Erich Martell, Assistant Appellate Defender
Santa Fe, NM

for Appellant

**MEMORANDUM OPINION**

**SUTIN, Judge.**

Defendant Jerry Castillo entered into a conditional plea of guilty for trafficking methamphetamine. Based on the conditional plea, Defendant appeals the denial of his motions to suppress physical evidence and admissions made by him during the stop and detention in this case. We affirm.

**BACKGROUND**

While conducting a saturation patrol on Central Avenue, in Albuquerque, New Mexico, Detective Candelaria and her partners, Sergeant Campbell and Detective Scrivner, observed a white SUV parked at a Long John Silver's restaurant with several individuals huddled around the rear passenger side of the vehicle. Detective Candelaria thought it was unusual for the individuals to be huddled around the vehicle, particularly because it was in the parking lot of a sit-down eatery. The location was a "high area for criminal activity," with "business complaints" of fights and loitering. The officers were working a specific plan in the area that included saturation of Central Avenue and addressing situations that appeared to be out of the ordinary. After noticing the individuals in the parking lot, Detective Candelaria and her partners parked nearby to observe. Detective Candelaria testified that she did not see any merchandise "such as a Coke or a bag from [the restaurant]." The officers watched the individuals for about eight to ten minutes and then drove closer to where the individuals were located and stopped about ten feet away. At that point, Detective

Candelaria saw one of the male individuals drinking a beer and observed him putting it in the SUV. Sergeant Campbell also observed the same male drinking a beer. Detective Candelaria and Sergeant Campbell testified that drinking in public was considered a violation of a city ordinance.

The officers exited their vehicle. As the officers approached the group, Detective Candelaria noticed two males sitting inside the vehicle. She testified that for safety reasons she told everyone, including the two individuals inside the vehicle, to show their hands and to exit the vehicle. The driver complied with the officer's commands, but Defendant, who was sitting in the rear passenger seat, stayed in the vehicle and reached behind the seat. Due to Defendant's non-compliance with the officer's verbal commands, Detective Candelaria drew her weapon for her safety and the other officer's safety, out of concern that Defendant "was going for a firearm or any kind of weapon." Detective Candelaria had repeatedly told Defendant to show his hands and to get out of the vehicle, but Defendant did not do so right away. Defendant eventually put his hands out where the officer could see them and exited the vehicle. At this point, for safety reasons and for investigation purposes, because he had not complied, the officer conducted a patdown of Defendant, handcuffed him, and had him sit on the ground.

While Defendant was sitting on the ground, the restaurant manager came out of the restaurant and asked the female, who was wearing a shirt that identified her as an employee of the restaurant, to change her shirt. Detective Candelaria walked the female to the SUV where the female pulled a shirt out of a duffel bag. When the shirt was pulled out of the bag, a plastic bag containing a white substance, as well as numerous other little baggies, some of which also contained the white substance, fell to the floor of the SUV. Detective Candelaria and the female individual looked at each other, and Defendant yelled, "That's mine. That's all mine." Defendant was then read his *Miranda* rights, after which "he indicated that the substance that was tangled up in the shirt was all his." The white substance was identified by Defendant as methamphetamine.

Defendant filed a motion to suppress the methamphetamine, arguing that there was no individualized suspicion that Defendant was involved in wrongdoing, and therefore, he was subjected to unlawful detention and seizure. Defendant also filed a motion to suppress his pre-*Miranda* admissions, arguing that due to the unlawful seizure, his statements should be suppressed, that his first admission was made prior to being Mirandized, and that his second admission was made too close in time to his pre-*Miranda* admission. The district court issued an order denying both motions. The district court found that the actions of the officers were justified, Defendant's first

4

admission was voluntary and not a result of custodial interrogation, and although Defendant's standing to contest the seizure of the methamphetamine was "questionable," the methamphetamine was seized without a search when the drugs were dropped in the presence of one of the officers. Defendant entered into a conditional plea and appealed the district court's judgment, sentence and order partially suspending sentence.

**DISCUSSION**

Defendant raises two issues on appeal: (1) whether the methamphetamine and Defendant's admissions should have been suppressed as fruits of an unlawful stop and arrest, and (2) whether Defendant's admissions should have been suppressed based on violation of *Miranda*. On appeal from a district court's ruling on a motion to suppress, findings of fact are reviewed to determine if they are supported by substantial evidence and legal conclusions are reviewed de novo. *See State v. Leyba*, 1997-NMCA-023, ¶ 8, 123 N.M. 159, 935 P.2d 1171. "We review the district court's ruling on a motion to suppress to determine whether the law was correctly applied to the facts, viewing the facts in the light most favorable to the prevailing party." *State v. Cline*, 1998-NMCA-154, ¶ 6, 126 N.M. 77, 966 P.2d 785.

**State Constitutional Claims**

5

The State claims that Defendant failed to adequately preserve his claims under the State Constitution. In both motions to suppress filed below, Defendant argued that our State Constitution "provides an additional layer of protection to criminal defendants than does the [F]ederal [C]onstitution." In both motions, Defendant argued that his detention was unlawful and referred to the facts to support his claim and to various New Mexico cases discussing unlawful detention. Defendant stated that he "preserves his claim[s] . . . under the [S]tate [C]onstitution" and cited to *State v. Gomez*, 1997-NMSC-006, 122 N.M. 777, 932 P.2d 1.

In *Gomez*, our Supreme Court stated that "[w]here New Mexico courts have taken a different path than federal courts, our precedent governs regardless of whether a party cites specific cases in support of a constitutional principle, so long as the party has asserted the principle recognized in the cases and has developed the facts adequately to give the opposing party an opportunity to respond and to give the court an opportunity to rule." *Id.* ¶ 30. While Defendant did adequately develop the relevant facts in this case, he did not assert any specific principle of state constitutional law that might apply to this case. It is therefore questionable whether Defendant adequately preserved his claims under our State Constitution. In any event, we have reviewed the case law, and we do not believe the result would be different under either the New Mexico Constitution or the Federal Constitution.

**Standing to Challenge Seizure of Drugs**

Defendant argues that, as a result of an unlawful detention and arrest, the officers engaged in "exploitation of that illegality" or "created the situation" whereby the female individual returned to the SUV and the drugs were discovered. Defendant claims that he has standing to challenge the seizure of the methamphetamine because the seizure was a result of his own unlawful detention.

The methamphetamine was not discovered in Defendant's vehicle, on his person, or in his personal effects. Instead, the drugs were found when they inadvertently fell out of a bag belonging to a third person. Under these circumstances, Defendant would not have standing to object to the seizure of the drugs unless the seizure of the drugs occurred because of police exploitation of Defendant's own unlawful detention. *See State v. Sewell*, 2009-NMSC-033, ¶ 16, 146 N.M. 428, 211 P.3d 885; *State v. Hernandez*, 1997-NMCA-006, ¶ 17, 122 N.M. 809, 932 P.2d 499. In order to answer the question of whether Defendant had standing to challenge the seizure of the drugs, we must determine first whether Defendant was unlawfully stopped and detained, and second, whether the officers were exploiting unlawful conduct with respect to Defendant in order to obtain the evidence.

**Legality of Stop and Detention**

In this case, the incident began as an encounter between several officers and four individuals, including Defendant. Defendant challenges the legality of the stop as to all of the individuals. In addition, Defendant claims that Detective Candelaria acted unlawfully when she ordered him to show his hands and exit the vehicle, when she drew her weapon while directing commands to Defendant, and when she handcuffed Defendant and placed him on the ground after conducting a patdown search for weapons.

The officers were conducting a saturation patrol, witnessed one of the individuals drinking a beer, and approached the group. An officer may make an investigatory stop if there exists reasonable suspicion, based on specific articulable facts and rational inferences, that the law has been or is being violated. *State v. Flores*, 1996-NMCA-059, ¶ 7, 122 N.M. 84, 920 P.2d 1038. "In determining whether reasonable suspicion exists, we examine the totality of the circumstances." *State v. Cardenas-Alvarez*, 2001-NMSC-017, ¶ 21, 130 N.M. 386, 25 P.3d 225. "This is a fact-specific inquiry that does not lend itself to bright-line rules." *State v. Duran*, 2005-NMSC-034, ¶ 23, 138 N.M. 414, 120 P.3d 836.

We are aware that a seizure does not occur merely because officers approach individuals and ask questions so long as the actions of the officers do not suggest that the individuals are required to answer the questions put to them. *See id.* ¶ 31.

However, the officers in this case did not simply approach and ask questions of the group, and in fact, the officers did not pose individual questions to the person who had been seen drinking the beer. Instead, immediately upon approaching the group, Detective Candelaria told everyone to show their hands and exit the vehicle.

In a previous case decided by this Court, we discussed an encounter that, at the outset, might have been characterized as a voluntary and consensual encounter, but was transformed into a non-consensual encounter based on the officer's primary goal of investigating a criminal matter. *See State v. Montaño*, 2009-NMCA-130, ¶ 21, 147 N.M. 379, 223 P.3d 376. We held that any initial consensual encounter did not surpass the officer's actions taken for the purposes of conducting a criminal investigation. *Id.* ¶ 22; *see State v. Gutierrez*, 2008-NMCA-015, ¶ 14, 143 N.M. 522, 177 P.3d 1096 (explaining that, despite the initial intention to merely ask a few questions, the officer's encounter with the defendant escalated into an investigatory detention requiring as support an objective belief that reasonable suspicion existed based on the totality of the circumstances and the information available to the officer).

Here, Detective Candelaria was suspicious of the group because they were "huddled behind the rear" door of the vehicle for some time, but she testified that the officers approached the group in order to investigate the commission of a crime based on their belief that a city ordinance was being violated. Detective Candelaria testified

9

that, if they had not seen one individual drinking alcohol, they "probably would have just kept on driving." Clearly, the encounter was for the purpose of investigating the possibility of a crime and simply does not fit within the guidelines for a consensual or voluntary encounter. Therefore, in order to justify the stop in this case, the officers must have had reasonable suspicion based on the circumstances and the information known to the officers at the time of the stop.

Detective Candelaria testified that reasonable suspicion permitted the officers to approach and conduct an investigation because drinking in public is illegal as a violation of a city ordinance. The parties stipulated at the suppression hearing that the location of the stop was on privately owned property that was open to the public. The ordinance relied on by the officer provides:

[Section] 12-4-8  DRINKING IN PUBLIC.

Drinking in public consists of drinking or consuming alcoholic liquors (as the term is defined in Section 60-3A-3 NMSA 1978, as amended):

(A)  In any city-owned park, except a park in which drinking is expressly permitted by resolution.

(B)  (1)  In any public way, except a public way within a city-owned park in which drinking is expressly permitted by resolution.

(2)  For purposes of this division (B), PUBLIC WAY is defined as the entire width between the property lines of every way publicly maintained when any part thereof is customarily open to the use of the public for purposes of vehicular travel and includes the street,

10

sidewalk, and any other area between the curb lines or lateral lines of the roadway and the adjacent property lines.

(C)    In any city owned parking lot, except a parking lot in a city-owned park in which drinking is expressly permitted by resolution.

(D)    Within 100 feet of any establishment licensed to dispense alcoholic liquors.

In the district court, Defendant argued that the male individual suspected of drinking a beer had not committed a crime because he was in a privately owned parking lot at the time the officers approached. Defendant argued that the "police misread" the ordinance, which applies only to public streets and public ways and not to private property. In Defendant's briefs, he continues to claim that the stop was made on "undeniably private property," and the officers approached the group based on a mistake of law, which cannot be used as the basis for a lawful stop. The State, on the other hand, contends the officers' mistake was one of fact, not law, and therefore does not affect the legality of the stop.

Our Supreme Court, in *State v. Hubble*, 2009-NMSC-014, 146 N.M. 70, 206 P.3d 579, discussed mistakes of law and fact in relation to reasonable suspicion. *Id.* ¶¶ 21-25. The Court explained that a mistake of law is a "mistake about the legal effect of a known fact or situation," and a mistake of fact is a "mistake about a fact that is material to a transaction; any mistake other than a mistake of law." *Id.* ¶ 22 (internal quotation marks and citation omitted). The Court further recognized that a

11

mistake of law, even a good faith and reasonable mistake cannot provide objective grounds to support reasonable suspicion. *Id.* Detective Candelaria's belief that one individual was violating the ordinance against drinking in public was based on a mistake of law. The officer testified repeatedly that she had no idea "who owned" the property, and she had no idea whether the property was privately or publicly owned at the time the officers decided to approach the group. Significantly, she did not testify that she thought the property might be owned by the city. In other words, the officer was mistaken about the law in that she mistakenly believed that the individual that was drinking alcohol was violating the city ordinance by drinking in public regardless of whether the conduct was carried out on public or private property. Because a mistake of law, even a reasonable or good faith mistake, does not provide the requisite reasonable suspicion to conduct a stop, the belief that one individual was violating a city ordinance did not provide justification for the stop.

We recognize that, even if a stop is based on a mistake of law, the stop may still be justified if facts articulated by the officer provide reasonable suspicion on another basis. *Id.* ¶¶ 28-29. However, there are no facts articulated by the officers, other than the belief that an ordinance was being violated, to support the stop in this case. In sum, the officers' approach cannot be characterized as a simple approach for questioning, and Detective Candelaria's mistake of law with respect to the city

12

ordinance did not provide reasonable suspicion to approach the group based on the observation that one individual was drinking alcohol. Therefore, the stop was unlawful.

Detective Candelaria approached the vehicle and asked that everyone, including Defendant, show their hands and exit the vehicle. She testified that her actions were out of concern for officer safety and that it was typical for her to make such requests. Defendant did not comply with the officer's requests, but instead "reached behind the seat," so that the officer was unable to see what Defendant was doing with his hand. At that moment, the officer drew her gun and repeated her commands for Defendant to show his hands and exit the vehicle. According to the officer's testimony, Defendant refused to comply for several minutes despite the fact that the officer had drawn her gun and was pointing it at him. Defendant kept his arm behind the seat. Ultimately, Defendant complied with the officer's demands.

These facts give rise to a possible issue as to whether, despite the illegality of the initial stop, there was a sufficient break between that unlawful stop and the further detention of Defendant, such that the detention was not tainted by the illegality of the stop. *Cf. State v. Neal*, 2007-NMSC-043, ¶ 34, 142 N.M. 176, 164 P.3d 57 (discussing the test for determining whether discovery of evidence as a result of consent was sufficiently attenuated from the prior illegal action of police). However,

the State did not make such an argument and, given our disposition of the case, we need not address that issue. We therefore assume, for purposes of this opinion, that the continued detention of Defendant, following the unlawful stop and continuing to the point where Defendant was placed on the ground, was unlawful. We now turn to the question of whether the illegal detention of Defendant was exploited in order to reveal the methamphetamine seized by the officers.

**Exploitation of Illegality**

The district court found that the baggies containing methamphetamine were not discovered as a result of the continued detention of Defendant. According to Defendant, the restaurant manager directed the female individual to cover her uniform as a direct result of the "improper and unlawful" arrest of Defendant. Defendant argues that the discovery of the methamphetamine "flowed" from the "exploitation" of the illegal arrest. Defendant claims that all evidence obtained in this case, including the drugs and Defendant's statements, must be suppressed as fruits of the poisonous tree.

The "fruit of the poisonous tree" doctrine requires suppression of all evidence discovered as a direct result of an illegal seizure. *State v. Garcia*, 2009-NMSC-046, ¶ 23, 147 N.M. 134, 217 P.3d 1032. The "fruit of the poisonous tree" doctrine prohibits evidence obtained as a result of an illegal arrest or detention to be admitted,

14

except in situations where there is a break in the chain between an unlawful arrest and a subsequent discovery of evidence. *State v. Hawkins*, 1999-NMCA-126, ¶ 16, 128 N.M. 245, 991 P.2d 989 (internal quotation marks and citation omitted). In order to determine whether there was sufficient attenuation between the illegality of the detention and the discovery of the drugs in this case, we give consideration to certain factors, including the presence of intervening circumstances and the flagrancy of the official misconduct. *See State v. Monteleone*, 2005-NMCA-129, ¶ 17, 138 N.M. 544, 123 P.3d 777.

The independent source doctrine provides that not all evidence is categorized as the "'fruit of the poisonous tree' simply because it would not have come to light but for the illegal actions of the police." *State v. Wagoner*, 2001-NMCA-014, ¶ 22, 130 N.M. 274, 24 P.3d 306 (internal quotation marks and citation omitted). Instead, even if it is shown that officers engaged in a "primary illegality," it must still be determined whether disputed evidence was obtained through the "exploitation of that illegality" or through other means that are "sufficiently distinguishable" so as "to be purged of the primary taint." *Id.* (internal quotation marks and citation omitted) (relying on *Wong Sun v. United States*, 371 U.S. 471, 487-88 (1963)).

We agree with the district court's conclusion that the discovery of the drugs was a result of a source independent of any illegality in police actions concerning

Defendant. Here, the methamphetamine was discovered when the restaurant manager directed the female individual to change her employee shirt. It is clear that the manager's request that the female individual cover her uniform was sufficiently distinguishable from any "primary illegality" involved in the stop or detention of Defendant. The chain of events with respect to Defendant involved an unlawful detention and seizure, a patdown search for weapons, and a further detention when he was placed on the ground in handcuffs. On the other hand, the chain of events involving the female individual and leading to discovery of the drugs began when the manager asked the female to change her shirt, continued when the female went to the vehicle to retrieve a shirt from a duffel bag inside the vehicle, and ended when the female pulled her shirt out of the bag inadvertently causing the drugs to fall to the floor of the vehicle.

Defendant points to no facts to support an argument or an inference that the officer accompanied the female to the SUV for exploitation purposes. We are not informed about why the officer followed the female. It would be reasonable, under the circumstances, that the officer could have been concerned about the female obtaining a weapon from the vehicle. Nothing indicates that the officer was aware of or anticipated that illegal contraband would be found in the SUV if the officer went with the female to the vehicle. For that matter, nothing indicates that the female knew

about the illegal contraband. There is simply no connection between the actions concerning Defendant and the discovery of the drugs. *See Monteleone*, 2005-NMCA-129, ¶ 17; *cf. State v. Santiago*, 2009-NMSC-045, ¶ 5, 147 N.M. 76, 217 P.3d 89 (noting that "courts have routinely held" that suppression of evidence is not required in situations where a third party voluntarily provides evidence belonging to another, and the direct or indirect involvement of the government in that transaction is minor or nonexistent).

In addition, there exists no evidence of misconduct by the officers in conducting the stop or placing Defendant on the ground in handcuffs. *Cf. Monteleone*, 2005-NMCA-129, ¶ 19 (explaining that the nature of the police misconduct and the state of vulnerability the defendant was placed in were an exploitation of the illegal entry and holding that the defendant's consent "was not obtained by means sufficiently distinguishable as to be purged of the primary taint" (internal quotation marks and citation omitted)). Furthermore, there is nothing to suggest that the officers exploited the situation in this case by causing the female individual to retrieve the shirt from her bag located in the vehicle, which resulted in the discovery of the drugs. The discovery of the methamphetamine was completely accidental and not a result of an order, request, or search by officers. In other words, the discovery of the drugs was not tainted by any illegal conduct directed at Defendant by the officers.

We hold that the district court was correct in determining that the methamphetamine was discovered as a result of an independent source. We therefore conclude that, because the drugs were not discovered as a result of actions toward Defendant or as a result of exploitation by the officers, Defendant had no standing to challenge the seizure of the evidence. *See Hernandez*, 1997-NMCA-006, ¶ 17.

**Defendant's Admissions**

Defendant claims that his pre and post-*Miranda* admissions should have been suppressed. Defendant raises his claims pursuant to *State v. Franklin*, 78 N.M. 127, 428 P.2d 982 (1967), and *State v. Boyer*, 103 N.M. 655, 712 P.2d 1 (Ct. App. 1985). Defendant was sitting on the ground in handcuffs when the methamphetamine fell to the floor of the SUV as the female pulled her shirt from the duffel bag. When the methamphetamine fell to the floor of the vehicle, Defendant yelled, "That's mine. That's all mine." Defendant claims that this statement was made "subject to interrogation when he was in custody." Contrary to Defendant's claim, there is nothing to indicate that the statement was made in response to any interrogation by police. *See State v. Greene*, 91 N.M. 207, 214, 572 P.2d 935, 942 (1977). There is nothing to suggest that the officers attempted to elicit Defendant's statement or that his statement was in response to questioning by police. *See State v. Fekete*, 120 N.M.

290, 300, 901 P.2d 708, 718 (1995). On the contrary, Defendant's statement was not the type of statement that the officers could have foreseen in this case. *Id.*

Defendant was subsequently provided with *Miranda* warnings, and he stated that he understood his rights. Defendant then admitted that the drugs belonged to him. Defendant claims that there was no break in the causal chain before any purported consent was obtained after the unlawful arrest, and therefore his second admission should have been suppressed. However, Defendant does not suggest that he did not voluntarily waive his *Miranda* rights before giving his statement or that police coerced him into giving the post-*Miranda* statement. *See Fekete*, 120 N.M. at 301, 901 P.2d at 719. The district court did not err in refusing to suppress Defendant's admissions.

**CONCLUSION**

We hold that the district court properly refused to suppress the methamphetamine and Defendant's admissions. We affirm the judgment and sentence in this case.

**IT IS SO ORDERED.**

_____

**JONATHAN B. SUTIN, Judge**

**WE CONCUR:**

_____

**CYNTHIA A. FRY, Chief Judge**

_____

**MICHAEL D. BUSTAMANTE, Judge**