This decision was not selected for publication in the New Mexico Appellate Reports. Please see Rule 12-405 NMRA for restrictions on the citation of non-precedential dispositions. Please also note that this electronic decision may contain computer-generated errors or other deviations from the official paper version filed by the Supreme Court.

# IN THE SUPREME COURT OF THE STATE OF NEW MEXICO

**Filing Date: <u>January 9, 2014</u>**

**NO. 33,363**

**STATE OF NEW MEXICO**,

      Plaintiff-Appellee,

**v.**

**DAVID VEGA,**

      Defendant-Appellant.

**APPEAL FROM THE DISTRICT COURT OF CHAVES COUNTY**
**Charles C. Currier, District Judge**

Gary K. King, Attorney General
Olga Serafimova**,** Assistant Attorney General
Santa Fe, NM

for Appellee


Jorge A. Alvarado, Chief Public Defender
Mary Barket, Assistant Appellant Defender
Santa Fe, NM

for Appellant

**DECISION**

**BOSSON, Justice.**

{1}     David Vega (Defendant) appeals from his two convictions for first-degree murder and three convictions for attempted first-degree murder. A jury found that Defendant fatally shot his twenty-five year-old son and his son's girlfriend at close range with a shotgun and that he later fired on police officers, wounding three, when they responded to the scene. Because the district court imposed life sentences for each of the first-degree murders, we review his convictions on direct appeal under Rule 12-102(A)(1) NMRA and affirm.

**BACKGROUND**

{2}     Defendant and his wife lived together at their home in Roswell. From time to time their adult son, Chris, and his girlfriend, Michelle, would move in with them and stay for an extended period of time. The last such occasion was in the spring of 2010, about a month before the tragic events underlying this case.

{3}     The evidence at trial showed that the situation in Defendant's home had been deteriorating in the days leading up to the night of the shootings. Just two days earlier, Defendant had summoned the police to his home to remove Chris and Michelle for trespassing. Defendant complained to the responding officer that the couple had refused to leave after he tried to evict them for providing his wife with prescription

pain medication. Defendant's wife confirmed for the officer that Chris and Michelle had been living in the house with her permission for at least a month. The officer then explained to Defendant that, because his wife had given Chris and Michelle permission to stay, they were not trespassing and that Defendant's only option was to pursue civil eviction proceedings. The officer warned Defendant and Chris that if the Roswell police had to respond to the house again, one or both of them would likely be arrested under the local public nuisance ordinance, colloquially referred to as "disorderly house." Chris assured the officers that he and Michelle were planning to move back to Albuquerque the next day.

{4}    Two days later, Defendant again called the Roswell police out to his home, renewing his request to have Chris and Michelle removed from his home. As before, the officers explained that removing the couple was a civil matter and that the officers could not arrest them.

{5}    At about 10:30 p.m. that same evening, Officer Keith Rightsell responded to another call to Defendant's address, this time from Chris and Michelle. When Officer Rightsell arrived, he found Chris and Michelle sitting outside because Defendant had locked them out of the house. Officer Rightsell testified that the pair appeared "pleasant" and "articulate;" they explained that they had been arguing with Defendant

3

about staying in the house. They also reported that Defendant was intoxicated and that the police had been out to the house earlier that evening. During this conversation, Officer Rightsell could hear Defendant inside the house slamming doors, cursing, and yelling. Officer Rightsell asked Chris and Michelle whether Defendant had any weapons in the home, and upon learning that there were guns inside, he radioed the other officer who had responded to the scene and asked him to provide armed backup assistance.

{6}     Defendant then appeared in the front doorway, and Officer Rightsell asked him to step outside. Defendant was cooperative and unarmed but kept getting distracted by Chris and Michelle and would begin yelling "profanities" and saying "very hateful things" about them, that they were "leeches" and "tweakers and drug users" and that he did not want them in his house. Due to Defendant's behavior, Officer Rightsell placed him in handcuffs and detained him in the back of the officer's patrol car so that he could continue his investigation. He learned from Chris and Michelle that Defendant's wife was at the hospital and that Defendant's nephew, Jeremy, who also lived at the house, was inside. Officer Rightsell went inside and spoke with Jeremy, confirming that Defendant's wife had given Chris and Michelle permission to stay. Officer Rightsell then returned outside. Fearing that the dispute would continue to

4

escalate into a "domestic violence issue," the officer arrested Defendant for operating a disorderly house.

{7} Defendant bonded out later that night, and his bondsman returned him home. According to the bondsman, Defendant did not seem intoxicated, although the bondsman smelled alcohol on Defendant and could tell that he had been drinking. The bondsman also testified that Defendant was not threatening or aggressive on the ride home, but that Defendant was "disappointed" with the police and "upset that he had called the police department [earlier in the day] and [yet] he was the one who got in trouble."

{8} A short time later, Defendant's nephew, Jeremy, who was in his room trying to sleep when Defendant returned home, heard Defendant walking through the house, pumping the action of a shotgun. Jeremy testified that he heard Defendant talking on the phone to a friend and repeatedly saying that he was "going to kill them." After Defendant hung up, Jeremy heard a series of sounds in rapid succession: footsteps approaching Chris and Michelle's room, loud banging on a door, a door being kicked and swinging open, and a shotgun blast. Jeremy then heard Michelle scream, "No, Dave. Dave, don't do it"—but before she could finish her sentence, the sound of three or four more shotgun blasts filled the house.

**{9}** Jeremy stayed in his room, too scared to come out. He again heard Defendant talking on the phone, this time saying, "I did it," that he was not going to be taken alive, and that "he was going to see how many he could take out before they took him out." Jeremy also heard the back door open and close multiple times, and after some time passed, he ventured out to check on Chris and Michelle. He saw Chris's body through the open door to their room, but before he could check on Michelle, he heard the back door open again, and he ran back to his room.

**{10}** About five minutes later, Defendant entered Jeremy's room and told him to leave because the police were going to arrive soon and Defendant did not want Jeremy to get hurt. Defendant also told Jeremy to give him some time before he called the police, stating that Jeremy owed him at least that much. Jeremy began to run for the door when Defendant stopped him and said, "get [your] shoes, dummy . . . . [y]ou're going to need them." Jeremy grabbed his shoes and his dog and ran out the back door. On his way out, Jeremy noticed three rifles propped against the sofa. He ran to a neighbor's house about three-and-a-half blocks away, called the police, and reported that Defendant had shot Chris, that he was armed, and that he would not be taken without a fight.

**{11}** Jeremy's phone call came at approximately 2:05 a.m., and the police dispatcher

radioed that a shooting had occurred. Approximately nine officers from the Roswell Police Department responded to the scene, including Officer Ted Sandoval, Officer Doyle Baker, and Officer Rightsell, who had arrested Defendant earlier that evening.

{12}     Officer Sandoval testified that he led the approach to the back of Defendant's home from an alley behind the house. Officer Sandoval took cover behind a wooden fence and, while he was assessing the situation, heard a voice over a loudspeaker announce that the Roswell Police Department was on the scene and directed Defendant to come out of his home. Officer Sandoval then stepped out from behind the fence, intending to approach the back door and to check for any survivors inside the house. Almost immediately, he heard a gunshot and felt "like [he] got hit with a baseball bat on [his] elbow." After hearing several more gunshots in quick succession, Officer Sandoval retreated from Defendant's back yard with the assistance of his fellow officer and ran back down the alley. Medical personnel later determined that Officer Sandoval had been hit with ten shotgun pellets—eight in his arm and two in his leg.

{13}     While Officer Sandoval was approaching Defendant's home from behind, Officer Rightsell was organizing the officers who had arrived at the front. Officer Rightsell testified that after he "got everybody where [he] wanted them," he

announced his presence several times and ordered Defendant, Jeremy, and anyone else inside the home to come out with their hands up. Hearing no response, another officer pulled up in a police cruiser, activated its flashing lights, and repeated Officer Rightsell's announcement over the car's loudspeaker. Moments later Officer Rightsell heard "three shots fired from the rear of the residence" that sounded like they came from a shotgun, followed by Officer Sandoval radioing that he had been shot.

{14}     Officer Rightsell had been taking cover behind the home of Defendant's neighbor, "stacked up" in a column with three other officers. After a brief lull, Officer Rightsell heard four more shots from Defendant's back yard—this time aimed towards the front of the house—and saw the bullets hit the ground at his feet. Officer Rightsell returned fire and, during the exchange of shots that followed, was knocked to his back by a shot to the head. As Officer Rightsell lay on the ground, he saw Defendant "stepping out, leaning around the corner[,] and thrusting" a silver-colored handgun at him, firing several times. Officer Rightsell, "bleeding profusely," fired back and felt someone pull him back behind the neighbor's wall and help him into a kneeling position. Defendant and Officer Rightsell were continuing to exchange fire when Officer Rightsell heard someone fire a shot from "right over the top of [his] head." He looked up and back from his knees and saw Officer Baker standing over him and

8

pointing a rifle in Defendant's direction.

{15} Officer Baker testified that he had joined the stack of officers behind Officer Rightsell as Officer Rightsell was exchanging fire with Defendant and backing up towards the neighbor's house. When Officer Rightsell stopped to reload, Officer Baker stepped out from behind the wall with his AR-15 patrol rifle and saw Defendant with his back to him. Officer Baker ordered, "Let me see your hands. Let me see your hands." Defendant turned around, and Officer Baker saw that he was holding "some type of long gun." Defendant pointed the long gun in Officer Baker's direction, and Officer Baker then fired his rifle, which malfunctioned. Officer Baker stepped back behind the wall, ejected the misfired round and inserted another one, stepped out behind Officer Rightsell, who was on his knees exchanging fire with Defendant, and fired at least one round at Defendant. Officer Baker confirmed that during the exchange he saw Defendant using a "polished silver handgun." Officer Baker also testified that, at some point during the confrontation, he "felt something hit [him] in the head."

{16} A short time later, Officer Baker radioed that Defendant was in his back yard, down and not armed. Officer Rightsell testified that he left his sheltered location, headed towards Defendant's back yard and found him laying on the ground in a "half

9

way fetal position." Officer Rightsell warned Defendant not to move and surveyed the back yard, seeing "shell casings everywhere, ammunition everywhere, . . . guns leaned up against the house, . . . [and] a pistol within reach of [Defendant]." Defendant was compliant and repeatedly asked the officers not to shoot his dog Roscoe, who was running around the back yard. Several officers then restrained Defendant, patted him down, found a shoulder holster on him, and removed a clip of ammunition from his shirt. It was later determined that Officer Rightsell had been shot in the chest and head by a shotgun. Officer Baker was treated for a minor injury on his forehead. A few days later, Officer Baker noticed something in his wound and touched it while he was standing over a sink. "[A] little blackball-type thing," consistent with "a BB that's in normal birdshot shotgun shells," fell out and went down the drain.

{17}     Defendant was arrested and charged with two counts of first-degree murder for the deaths of Chris and Michelle and with three counts of attempted first-degree murder based on his exchanges with Officers Sandoval, Rightsell, and Baker. He also was charged with assault with intent to commit a violent felony, related to an uninjured officer who was in the line of fire when Defendant shot at Officer Sandoval, and with shooting at a dwelling or occupied building. The assault count was dismissed with a directed verdict after the close of the State's evidence at trial. The State

10

dismissed the count for shooting at a dwelling before trial due to insufficient evidence.

{18}     In his defense, Defendant argued several theories at trial. Chief among these was that he lacked the ability to form the specific intent required for first-degree murder due to his intoxication and a mental disorder. Defendant claimed that he had no memory of shooting Chris and Michelle and that he believed that the police were drug dealers who had surrounded his house when he fired at them. He also testified that he was a former U.S. Marine and an experienced marksman and that when he fired his guns that night, he was not trying to kill anyone, only trying "to scare them away."

{19}     The jury deliberated for only two hours before convicting Defendant of the first-degree murders of Chris and Michelle and of the attempted first-degree murders of Officers Sandoval, Rightsell, and Baker. The district court sentenced him to two consecutive life sentences for the former, and three concurrent nine-year sentences for the latter, to be served concurrently with Defendant's second life sentence. Defendant appeals.

**DISCUSSION**

{20}     Defendant raises seven issues on appeal. For issues one and two, he contends that the jury was improperly instructed on the theory of transferred intent and on his

defense of diminished capacity. As for issue three, Defendant argues that the district court should have declared a mistrial when it became apparent that defense counsel had failed to discover material evidence until just before trial. For issue four, Defendant maintains that the district court should have granted Defendant's motion to sever the murder charges from those for attempted murder. For issue five, Defendant challenges the sufficiency of the evidence supporting his convictions for attempted first-degree murder. Regarding issue six, Defendant claims that his convictions for the attempted first-degree murders of both Officers Rightsell and Baker violated double jeopardy. Finally, for issue seven, Defendant contends that the district court erred by running his life sentences concurrently instead of consecutively. We address each appellate issue sequentially and conclude that none has merit.

**Issue 1: Transferred Intent Is Irrelevant Because the Jury Was Not Instructed on a Theory of Transferred Intent**

{21} In this case, the jury was instructed on the three attempted-first-degree-murder counts substantially as follows:

> For you to find the defendant guilty of an attempt to commit the crime of first degree murder of Ted Sandoval, *or any other human being*, as charged in Count 3, the state must prove to your satisfaction beyond a reasonable doubt each of the following elements of the crime:
>
> 1. The defendant intended to commit the crime of first degree murder;

2. The defendant began to do an act which constituted a substantial part of the first degree murder but failed to commit the first degree murder;

3. The defendant was not intoxicated from use of alcohol or suffering from a mental disorder at the time the offense was committed to the extent of being incapable of forming an intent to kill Ted Sandoval *or another*;

4. This happened in New Mexico on or about the 10th day of May, 2010.

(Emphasis added.)

{22}     Defendant first challenges his convictions for attempted first-degree murder because the phrases "or another" and "or any other human being" were included in the jury instructions. He contends that these phrases "reflect[] a transferred intent theory of the case," a theory, he argues, that (1) does not apply to *attempted* first-degree murder (as opposed to first-degree murder) as a matter of law, (2) is not supported by the evidence, and (3) permitted the jury to convict him of a crime beyond what the statute allows. We do not reach these arguments because we disagree with Defendant's basic premise that the instructions, standing alone, introduced the concept of transferred intent to the jury with respect to attempted first-degree murder.

{23}     We first note that each of Defendant's arguments on this point rests on the same assumption: the jury instructions, by themselves, introduced the theory of transferred

intent into this case. To be clear, Defendant does not contend that the State actually pursued a theory of transferred intent at trial—in fact, he maintains just the opposite, that the State did *not* argue or present evidence in support of such a theory, but that the jury was nonetheless allowed to convict him based on that theory as a result of the language in the jury instruction. Thus, if we disagree that the jury instructions introduced a theory of transferred intent to the jury, Defendant's remaining arguments about the legal and factual propriety of that theory are immaterial.

{24}    Previously, this Court explained that transferred intent "is a legal fiction that is used to hold a defendant criminally liable to the full extent of his or her criminal culpability." *State v. Fekete*, 1995-NMSC-049, ¶ 21, 120 N.M. 290, 901 P.2d 708. Traditionally, it has been used in "bad-aim" cases when an accused, intending to kill one person, inadvertently kills another. *See id.* In such a circumstance, "the perpetrator's intent to kill or injure a specific victim transfers to the unintended victim." *Id.* Essentially, the accused cannot use his bad aim as a defense to first-degree murder, as long as he possessed the requisite intent towards someone.

{25}    Defendant relies on the use notes to our jury instructions to argue that the above-emphasized language necessarily "reflects a transferred intent theory of the case." *See* UJI 14-201 NMRA use note 2 (providing that the bracketed language, ["or

14

any other human being]," should be included in the instruction for first-degree murder when "the evidence shows that the defendant had a deliberate design to kill someone but not necessarily the victim"); UJI 14-255 NMRA use note (providing that the instruction defining transferred intent does not need to be given when the charge is first-degree murder because of the alternate language included in that instruction). In essence, Defendant argues that, because the use notes recommend that the phrase "or any other human being" be included in the instruction when a theory of transferred intent is presented to the jury, then the use of that language *necessarily* signals "a transferred intent theory of the case."

{26}     Our holding in *Fekete* forecloses that argument. *See Fekete,* 1995-NMSC-049. In *Fekete*, a jury convicted the defendant of the first-degree murder of a man whom he encountered on the downtown streets of Silver City. *Id.* ¶ 7. At trial, the state introduced the defendant's admission that he killed the victim while he was walking the streets "searching for someone to shoot," though it did not matter whom. *Id.* The jury convicted Fekete of first-degree murder based on an instruction, similar to the one before us now, that provided that he intended to kill the victim "or any other human being." *Id.* ¶ 19.

{27}     Relying on the same use notes as Defendant does in this case, defendant Fekete

urged this Court to hold that the phrase "or any other human being" could be used *only* when there was evidence to support a theory of transferred intent, which he claimed had not been argued at trial. *See id.* ¶ 20. We agreed with *Fekete* that his was not a transferred intent case and that the challenged language "is to be used primarily in cases involving transferred intent." *Id.* ¶ 25. However, "we decline[d] to absolutely limit the inclusion of this language to those situations" that involve transferred intent. *Id.* (reasoning that "[t]o do so would bar the trial court from determining that an instruction may, when viewed in the context of other instructions in their entirety, provide guidance to the jury").

{28}     We then considered Fekete's theory of his defense, which was that his intent to kill "someone" was insufficient to prove that he intended to kill the particular victim. We concluded that the use of the pertinent phrase clarified for the jury that "our first degree murder statute is not specific regarding the identity of the victim." *Id.* ¶ 27. In other words, our deliberate-murder statute does not require the State to prove that the accused knew the victim's identity at the time of the killing or even intended to kill only that particular person. "New Mexico's statute addresses this concern by defining homicide as the "'killing of one human being by another.'" *Id.* ¶ 23*; But see id.* ¶ 27. (noting that the use of the transferred intent instruction may

16

result in reversible error when the identity of the victim is an essential element of the crime, such as a crime against a police officer). Thus, the phrase "or any other human being" clarified the state's burden of proof with regard to an essential element of first-degree murder under the facts of the case; namely, that the deliberate intent to kill "someone," followed by the deliberately intentional killing of the victim satisfied the requirements of first-degree murder irrespective of any theory of transferred intent.

{29}     In Defendant's case, even assuming arguendo that a theory of transferred intent would not apply to attempted murder, we conclude that the language "or another" and "or any other human being" did not transform this into a transferred-intent case any more than use of the same language did in *Fekete*. Rather, as in that case, the language was used for another, legitimate purpose. It helped clarify for the jury that our first-degree murder statute does not require the State to prove that Defendant intended to kill Officers Sandoval, Rightsell, and Baker in particular. Under the circumstances of this case, it was sufficient for the State to prove that Defendant intended to kill the person (or persons) at whom he shot, regardless of that person's identity and regardless of whether he knew he was shooting at police officers. We find the State's explanation to the district court helpful on this point:

> [W]e don't believe that the State should have to show that [Defendant knew that the victim] was, specifically, Ted Sandoval[;] it should be Ted

17

Sandoval *or another person*. He was the one who happened to be hit, but we're not saying that the Defendant knew at the time of the shooting [that] Ted Sandoval was out there, Doyle Baker [or] that Keith Rightsell was out there.

(Emphasis added.) That reasoning—to which defense counsel did not object at trial—is consistent with our case law. *See Fekete*, 1995-NMSC-049, ¶¶ 26-27. As a result, we conclude that the jury instructions, standing alone, did not introduce a theory of transferred intent into this case, and we need not reach Defendant's arguments about the propriety of that theory with respect to a prosecution for attempted murder.

**Issue 2: The District Court's Modification of UJI 14-5110 NMRA Was Harmless**

{30}    Defendant's second claim of error also relates to the jury instructions. Based on evidence that Defendant was intoxicated on the night of the shootings and in poor mental health generally, Defendant requested that the jury be instructed to consider whether his intoxication or "suffering from a mental disease or disorder" prevented him from forming the requisite intent for each of the specific-intent crimes with which he was charged. *See* UJI 14-5110 NMRA (providing a defense to first-degree murder based on the inability to form a deliberate intention to take away the life of another due to intoxication or "suffering from a mental disease or disorder"); UJI 14-5111 NMRA (providing a defense to "nonhomicide" crimes based on the inability to form

18

an intent "to do a further act or achieve a further consequence" due to intoxication or "suffering from a mental disease or disorder").

{31} The State stipulated to the intoxication portion of the instructions, but maintained that the evidence was insufficient to instruct the jury to consider whether Defendant was "[suffering from] a mental disease or disorder." The district court effectively split the difference on the latter question, concluding that there was insufficient evidence to instruct the jury to consider whether Defendant was suffering from a mental *disease* but that there was sufficient evidence for the jury to consider whether he was suffering from a mental *disorder*. The court, therefore, approved only the phrase "suffering from a mental disorder" for use in the jury instructions.

{32} Defendant now maintains that the district court's omission of the word *disease* denied him of the right to have the jury instructed on his theory of the case. He claims that the omission "deprived the jury from fully considering [his] defense . . . [and] undermined the seriousness of mental impairment as a viable defense." We review the denial of a requested jury instruction de novo. *See, e.g.*, *State v. Rudolfo*, 2008-NMSC-036, ¶ 13, 144 N.M. 305, 187 P.3d 170 (reviewing de novo whether the defendant presented sufficient evidence at trial to support a self-defense instruction). "A defendant is not entitled to a . . . [defense] instruction unless it is justified by

sufficient evidence on every element of [the defense]." *Id.* ¶ 17.

{33}     The question, therefore, is whether Defendant introduced sufficient evidence at trial to justify an instruction about whether he suffered from a mental *disease* as opposed to a *disorder*. Defendant's expert, Dr. Roll, provided the only testimony that could have supported such an instruction. Dr. Roll testified that he administered a battery of psychological measures to Defendant and that, in his opinion, Defendant's performance was "consistent with someone who has some organic [brain] damage," which Dr. Roll attributed to injuries that Defendant suffered in a previous automobile accident. Dr. Roll also testified that Defendant's IQ and memory function are in the nineteenth and eighteenth percentiles, respectively; that he operates "at the borderline retarded level"; and that he has "a severe impairment in reality testing" that "will result in frequent failures to anticipate the consequences of his actions." Defendant highlighted this expert testimony in his closing argument.

{34}     Dr. Roll did not address specifically whether Defendant suffered from a mental *disorder* or *disease*. The closest that he came to the issue was in the following question-and-response during his direct examination:

> Q:     Did you formulate any opinions regarding Mr. Vega's situation as to whether he reached the criteria in the psychological field [for] something like mental disturbance or to such a degree [as] mental disturbance?

20

A: He clearly—we have different tables. Mental disturbance, mental deficiency, those are all synonyms and he has reached capacity—ability of putting him in that category based on the objective data.

Q: And would that be your opinion as to Mr. Vega, that he meets that criteria?

A: He does meet that criteria.

Thus, Dr. Roll's testimony suggests that, at least as far as mental *disturbance* and *deficiency* are concerned, the terms are interchangeable.

{35} The phrases *mental disease* and *mental disorder* are not defined in UJI 5110 or 5111. But UJI 14- 5101 NMRA, the instruction for the insanity defense, defines the phrase *mental disease* as a type of *disorder*:

> *A mental disease is a specific disorder of the mind* that both substantially affects mental processes and substantially impairs behavior controls. This specific disorder must also be a long-standing disorder. It must extend over a considerable period of time, as distinguished from a momentary condition arising under the pressure of circumstances.
>
> The term mental disease does not include a personality disorder or an abnormality manifested only by repeated criminal conduct or by other anti-social conduct.

(Emphasis added.) This definition, at the very least, indicates that to the extent the terms are distinct, a mental *disease* is subsumed within a mental *disorder*.

{36} Defendant's proffered definitions of mental *disorder* and mental *disease*

support that conclusion. Using Defendant's requested instruction, the court defined mental *disorder* for the jury as "the substantial disorder of the person's emotional processes, thought or cognition which grossly impairs judgment, behavior or capacity to recognize reality, but does not mean developmental disability." The court refused Defendant's proffered instruction for mental *disease*, which he defined as "any abnormal condition of the mind which substantially affects mental or emotional processes and substantively impairs behavior controls. The disease must extend over a considerable period of time and not [be] a momentary disease caused by the pressure of circumstance."

{37}     Based on the information and arguments before us, we fail to see a meaningful distinction between Defendant's definitions or the commonly understood meanings of the terms mental *disease* and *disorder* under the facts of this case. Put differently, we do not see how inclusion of the seemingly narrower term *disease* and Defendant's proffered definition in the jury instructions would have added anything substantive to the jury's deliberations. *See* UJI-Criminal general use note (providing that a uniform instruction on the elements of a crime or defense "must be used without substantive modification or substitution"). We also do not see how omission of the term *disease* and the accompanying definition confused the jury or deprived

22

Defendant of the ability to argue that he lacked the ability to form the deliberate intent to commit the crimes with which he was charged. Our conclusion on this matter is without prejudice to future efforts, if any, to educate this Court as to the importance of any such distinction.

{38}    It appears that the district court's decision to instruct the jury on *disorder* and not *disease* was but a Solomonic gesture that acknowledged the State's objection to the instruction but still gave Defendant the full benefit of the defense. The jury was instructed to consider whether Defendant was so intoxicated or suffering from a mental disorder that he was incapable of forming the requisite intent for each of the crimes with which he was charged. Defendant was permitted to argue—and did argue—that the State failed to prove that he was capable of forming the requisite intent. The jury deliberated for less than two hours before returning a guilty verdict on all counts.

{39}    Thus, we are not convinced that if the district court had included the term *disease* in the jury instructions as well as Defendant's requested definition, that the jury "probably" or even "possibly" would have arrived at a different result. *State v. Tollardo*, 2012-NMSC-008, ¶ 36, 275 P.3d 110 (reaffirming the distinction that non-constitutional error is harmless only when there is no reasonable "probability" that the

23

error affected the verdict and that constitutional error is harmless only when there is no reasonable "possibility" that the error affected the verdict). Clearly, the jury did not accept Defendant's argument that he was unable to form the intent to carry out the crimes with which he was charged. We therefore conclude that, even if the omission of the word *disease* from the jury instructions were error, a conclusion we do not reach, then the error was harmless and does not require setting aside or vacating the judgment in this case.

**Issue 3: The District Court Did Not Err by Refusing to Declare a Mistrial**

{40} For his third claim, Defendant argues that the district court abused its discretion when it refused to declare a mistrial due to defense counsel's late discovery of certain medical records that Defendant claims were material to his defense. Shortly before trial, defense counsel informed the court that he was concerned that some of Defendant's medical records, namely x-rays and radiology reports, were missing from the records disclosed by the State. On the fourth day of the five-day trial, defense counsel informed the court that, upon his own request, he had received and reviewed the subject records and had learned for the first time—during trial—that Defendant had sustained injuries consistent with being shot with a shotgun. Defense counsel moved for a mistrial, arguing that the State had failed to disclose the records, which

24

he argued were potentially exculpatory and "would refute possibly the entire theory of this case."

**{41}** We review the denial of a motion for a mistrial for an abuse of discretion, and we will affirm unless the denial was "obviously erroneous, arbitrary, or unwarranted." *State v. Gallegos*, 2009-NMSC-017, ¶ 21, 146 N.M. 88, 206 P.3d 993. Here, despite nearing the end of a high-profile, multi-day trial, the district court declared a recess for an entire morning to investigate the circumstances of the State's disclosures and to interview the medical personnel who had prepared the disputed radiology reports. After investigating the State's disclosures, the court found that, although the State did not provide Defendant with physical copies of the particular records, it had made the records available electronically to Defendant nearly ten months before trial. The court also noted that Defendant had the ability to obtain the records through an independent request from Defendant's medical providers, but had failed to do so. The court therefore denied the motion for a mistrial because the court was satisfied that the State had met its discovery obligations.

**{42}** Our review of the record supports the district court's findings, and we agree that the State did not fail to disclose the disputed evidence. Indeed, defense counsel admitted that he had "assumed, apparently erroneously," that the State had provided

25

his office with hard copies of all of the documents that had been electronically disclosed. Defense counsel was mistaken, but not because of misrepresentations by the State. We therefore hold that the district court did not abuse its discretion in denying Defendant's motion for a mistrial.

{43}     Defendant also contends that the district court should have ordered a mistrial once the "exculpatory nature" of the evidence in the medical records became clear. Defendant effectively concedes that this issue was not preserved, and we therefore review this claim for fundamental error. Fundamental error occurs when permitting a conviction to stand would result in a "miscarriage of justice." *State v. Barber*, 2004-NMSC-019, ¶ 17, 135 N.M. 621, 92 P.3d 633 (holding that fundamental error "has been used both to describe cases with defendants who are indisputably innocent, and cases in which a mistake in the process makes a conviction fundamentally unfair notwithstanding the apparent guilt of the accused"); *see also State v. Day*, 1980-NMSC-032, ¶ 19, 94 N.M. 753, 617 P.2d 142 ("[A] motion for a mistrial . . . generally is used to specify such fundamental error in a trial as to vitiate the result.").

{44}     In an on-the-record telephonic interview of a radiologist who reviewed the disputed medical records, the district court confirmed that a CT scan taken of Defendant after the confrontation with Roswell police showed what appeared to be 13

to 14 BBs scattered throughout his upper body. Counsel for the State and Defendant were present during the interview and were permitted to question the radiologist. After the interview, the court permitted the trial to continue without objection from Defendant. The court noted that no witnesses had testified yet about firing a weapon and that Defendant was free to cross-examine any remaining witnesses about the CT scan and the BBs found in Defendant's body, and about whether any of the officers had fired a shotgun at Defendant.

{45} Defendant acknowledges that he took advantage of the medical evidence during cross-examination and his closing argument, but he contends that he was prejudiced by the inability to present medical testimony that he, "*like the officers wounded during the chaotic encounter*, had sustained shotgun wounds, including one to his back." He argues that a mistrial was warranted to protect his right to fully present his defense and his right to be convicted only on adequately reliable evidence.

{46} We agree with the State that the district court's decision not to declare a mistrial *sua sponte* was not fundamental error. While the evidence may have suggested that someone other than Defendant also fired at and hit Officers Sandoval, Rightsell, and Baker, the fact remains that according to his own testimony, Defendant fired his shotgun and pistol multiple times in the direction of the officers. This point also was

27

borne out by the forensic evidence introduced at trial. Defendant was convicted of *attempted* murder of these three officers, a crime amply supported by the evidence. *See* NMSA 1978, § 30-2-1(A)(1) (defining first-degree murder as "any kind of willful, deliberate and premeditated killing"); *id.* § 30-28-1 (defining attempt to commit a felony as "an overt act in furtherance of and with intent to commit a felony and tending but failing to effect its commission"). We therefore conclude that failing to declare a mistrial based on the late-discovered evidence did not result in a miscarriage of justice, and the district court did not commit fundamental error.

**Issue 4: Denial of Defendant's Motion to Sever Was Not Error**

{47}    Defendant next claims that the district court committed reversible error when it denied his motion to sever the three attempted-murder charges from the murder charges of Chris and Michelle. Defendant contends that he should be retried on the murder charges because the evidence of the attempted murders "undoubtedly tainted the jurors['] consideration of the two first degree murder counts and, in this way, prejudiced [his] case [against the murder charges]—a case in which he had a solid defense of voluntary intoxication and mental impairment which [could] have resulted in second degree murder convictions."

{48}    When evaluating the denial of a motion to sever, we look to the record to

28

determine whether "prejudicial testimony, inadmissible in a separate trial, is admitted in a joint trial." *State v. Lovett*, 2012-NMSC-036, ¶ 11, 286 P.3d 265 (quoting *State v. Dominguez*, 2007-NMSC-060, ¶ 10, 142 N.M. 811, 171 P.3d 750). Thus, we first must determine if evidence of the attempted murders would have been inadmissible in a separate trial for the murders of Chris and Michelle if those charges had been tried separately. If inadmissible, we look to whether admission of the evidence actually prejudiced Defendant's ability to defend against the murder charges or was harmless error. *See id.*

{49}     Defendant makes two arguments that evidence of the attempted murders would not have been admissible in a separate trial for the murders of Chris and Michelle. First, he argues that the evidence would have been inadmissible propensity evidence under Rule 11-404(B), which prohibits the admission of evidence of crimes, wrongs, or other acts "to prove a person's character in order to show that on a particular occasion the person acted in accordance with the character." Rule 11-404(B)(1). However, the rule also provides exceptions, allowing such evidence for a purpose other than propensity, "such as proving motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident." Rule 11-404(B)(2).

{50}     The State argues that evidence of the stand-off with law enforcement would

have been admissible in a separate murder trial to prove Defendant's state of mind when he shot Chris and Michelle. Specifically, the State points to evidence of Defendant's actions in the forty-five minutes after he shot Chris and Michelle as "highly probative" of Defendant's state of mind at and around the time of the killings. The State points to the following examples: Defendant (1) asked his nephew, Jeremy, to give him time before calling the police; (2) prepared for the stand-off by taking multiple weapons out of a locked closet and into his back yard; (3) turned off the lights to his house; (4) armed himself with a pistol, a shotgun, and a shoulder holster with a full magazine; and (5) waited until the officers came into the open before firing at them.

{51} We have recognized that proving state of mind can justify the admission of evidence of crimes, wrongs, or other acts. *See, e.g.*, *State v. Branch*, 2010-NMSC-042, ¶ 13, 148 N.M. 601, 241 P.3d 602 ("[W]e . . . emphasize that the time between incidents is an important factor to consider when determining the admissibility of a prior crime, wrong, or act under Rule 11-404(B) to establish a defendant's state of mind."). Given the methodical nature of Defendant's actions—his preparation and execution of a plan in anticipation of an armed police response—and their temporal proximity to the killings, we agree with the State that this evidence was highly

30

probative of Defendant's state of mind when he shot and killed Chris and Michelle, that the killings were wilful and deliberate as a conviction for first-degree murder requires.

{52} The relevancy of this state-of-mind evidence is particularly acute in light of the defenses Defendant attempted to interpose—voluntary intoxication and diminished capacity—defenses that were designed to demonstrate to the jury a different state of mind, one unable to form the necessary intent to commit first-degree, wilful and deliberate murder. *Contra id., Branch*, 2010-NMSC-042, ¶¶ 12-13 (holding that evidence of the defendant's state of mind during a robbery *five years before* the murder with which he was charged was inadmissible to prove his state of mind during the murder). Defendant's state of mind at the time he killed Chris and Michelle was pivotal and hotly in dispute during the trial. Having concluded that evidence of Defendant's actions immediately after the killings and leading up to the shootout would have been admissible, even in a *separate* murder trial, we, therefore, find that the district court did not err in denying the motion to sever under Rule 11-404(B).

{53} Even in light of the foregoing, Defendant argues that evidence of the stand-off with law enforcement would have been excluded from a separate trial as unfairly prejudicial under Rule 11-403 NMRA because of "the esteem with which the public

31

regards police officers." Under Rule 11-403, we must determine if the danger of unfair prejudice substantially outweighs the probative value of the disputed evidence.

{54} We already have determined that evidence of the stand-off with law enforcement was relevant to show Defendant's state of mind during the murders and to rebut the defenses of voluntary intoxication and diminished capacity. On the other side of the Rule 11-403 inquiry, we view the risk of unfair prejudice as minimal. It is true, as Defendant asserts, that the public may generally have a high regard for police officers. Balanced against that is the evidence that Defendant shot and killed his own son, seemingly in a cold-blooded way. With that in mind, it seems unlikely that evidence identifying the subsequent attempted-murder victims as police officers would cause Defendant any more prejudice than had already occurred.

**Issue 5: Sufficient Evidence Supported the Attempted First-Degree Murder Convictions**

{55} Defendant contends that the State failed to introduce sufficient evidence that he shot at Officers Sandoval, Rightsell, and Baker with a deliberate intent to murder them. He maintains that the evidence demonstrated, at most, that Defendant was willing to "fire at them to keep them away," not to kill them. He also contends that evidence of his intoxication and diminished capacity, together with evidence that he selected only bird shot when loading his shotgun—"a generally non-lethal form of

32

ammunition"—collectively demonstrate his intent "not to kill."

**{56}** When reviewing for sufficiency of the evidence, we view the evidence "in the light most favorable to the guilty verdict, indulging all reasonable inferences and resolving all conflicts in the evidence in favor of the verdict." *State v. Guerra*, 2012-NMSC-027, ¶ 10, 284 P.3d 1076. The State contends that evidence of Defendant's deliberation was "overwhelming." The State points to: (1) Defendant's multiple statements prior to the arrival of the police that he would not be taken alive; (2) his comment to his nephew Jeremy that he would "take out" as many officers as he could; (3) his direction to Jeremy to leave the house so that he would not get hurt; (4) his request to Jeremy to give him time before calling the police; (5) his retrieval of his shotguns from a locked closet and placement of them in his living room and back yard; (6) his turning off of the lights in his house; and (7) his waiting to fire on Officer Sandoval until the officer stepped out from cover. The State also contends that Defendant's use of bird shot establishes nothing about Defendant's intent "not to kill"; rather, the State points out that the very same bird shot was lethal when used on Chris and Michelle earlier that night.

**{57}** Based on this evidence, we agree that the jury reasonably could have concluded that Defendant formed the deliberate intent to kill Officers Sandoval, Rightsell, and

33

Baker. *See, e.g.*, *Rudolfo*, 2008-NMSC-036, ¶ 29 ("The question before us as a reviewing [c]ourt is not whether we would have had a reasonable doubt but whether it would have been impermissibly unreasonable for a jury to have concluded otherwise."). We, therefore, hold that Defendant's three attempted first-degree murder convictions were supported by sufficient evidence.

**Issue 6: Defendant's Attempted First-Degree Murder Convictions Do Not Violate Double Jeopardy**

{58}     Defendant next challenges his two attempted-murder convictions of Officers Rightsell and Baker as a violation of his right to be free from double jeopardy. At the sentencing hearing, defense counsel argued that, "although there [were] sufficient indicia of distinctness between the shots fired towards Officer Sandoval in the back yard and those fired at Officers Rightsell and Baker in the front yard, only one conviction was appropriate for [Defendant's] conduct of firing at [both] Rightsell and Baker" in the front yard. Defendant argues that, based on the factors articulated in our unit-of-prosecution cases, *see, e.g.*, *State v. Bernal*, 2006-NMSC-050, ¶ 15, 140 N.M. 644, 146 P.3d 289, the Legislature did not intend multiple attempted first-degree murder convictions based on Defendant's "unitary conduct" of firing "in the general area of the officers in the front yard." Defendant claims there should be only one attempted murder conviction arising from the shots fired in the front yard in the

34

general direction of these two officers. We review Defendant's double jeopardy claim de novo. *See e.g.*, *Bernal*, 2006-NMSC-050, ¶ 6

{59}   To begin, we agree that Defendant has raised a unit-of-prosecution claim; he has challenged his two convictions under the same statutes for what was arguably a single course of conduct with a single criminal intent. *See e.g.*, *Bernal*, 2006-NMSC-050, ¶ 7 ("Multiple punishment problems can arise from both 'double- description' claims, in which a single act results in multiple charges under different criminal statutes, and 'unit-of-prosecution' claims, in which an individual is convicted of multiple violations of the same criminal statute." (quoting *Swafford v. State*, 1991-NMSC-043, ¶¶ 8-9, 112 N.M. 3, 810 P.2d 1223)). Our unit-of-prosecution analysis requires us first to look to the relevant statutory language for legislative guidance on the unit of prosecution. *Id.* ¶ 14. If no unit of prosecution is apparent from the statute, we look to whether "a defendant's acts are separated by sufficient 'indicia of distinctness' to justify multiple punishments under the same statute." *Id.* (quoting *State v. Barr*, 1999-NMCA-081, ¶ 15, 127 N.M. 504, 984 P.2d 185).

{60}   Initially, we agree with the State that, under our first-degree murder statute, the unit of prosecution is unambiguous: the "killing of one human being by another." Section 30-2-1(A) ("Murder in the first degree is the killing of one human being by

35

another . . . ."). The number of murder charges depends on the number of victims. The notion that "one death should result in only one homicide conviction" is firmly embedded in our jurisprudence. *See, e.g.*, *State v. Montoya*, 2013-NMSC-020, ¶ 43, 306 P.3d 426 (noting that, in *State v. Santillanes*, 2001-NMSC-018, ¶ 5, 130 N.M. 464, 27 P.3d 436, "[w]e specifically affirmed the reasoning of the Court of Appeals 'that one death should result in only one homicide conviction' under New Mexico law."). Thus, if Defendant's attempt had been more fruitful, actually killing both officers in the front yard, then unquestionably he would have been subject to *two*, not one, murder charges. Defendant has offered no reason why the unit of prosecution for *attempted* first-degree murder should be different, and we see none. *Cf. Bernal*, 2006-NMSC-050, ¶ 23 (analyzing the unit of prosecution for robbery and attempted robbery as the unit of prosecution for robbery).

{61} In the front yard, Defendant shot in the direction of—and hit—both Officers Rightsell and Baker, but fortunately, he did not kill them. Based on the unit of prosecution for first-degree murder, we conclude that this evidence, coupled with the evidence of Defendant's deliberate intent to kill whoever responded to the scene that night and not to be taken alive, was enough to justify separate punishments for the attempted first-degree murders of both officers. *See* NMSA 1978, § 30-28-1 (1963)

("Attempt to commit a felony consists of an overt act in furtherance of and with intent to commit a felony and tending but failing to effect its commission.").

{62}     Even if the unit of prosecution for attempted first-degree murder were ambiguous, our case law demonstrates that Defendant's multiple shots in the direction of Officers Rightsell and Baker are sufficiently distinct to merit separate convictions. We have identified six factors to aid in determining whether multiple convictions are warranted under a single statute that is ambiguous about the Legislature's intended unit of prosecution: "(1) temporal proximity of [the acts], (2) location of the victim during each [act], (3) existence of an intervening event, (4) sequencing of [acts], (5) defendant's intent as evidenced by his conduct and utterances, and (6) the number of victims." *Bernal*, 2006-NMSC-050, ¶ 15.

{63}     Defendant is correct that some of the factors point away from separate convictions for the attempted first-degree murders of Officers Rightsell and Baker. For example, the evidence shows that Defendant's shots in the direction of Officers Rightsell and Baker were close in time and that the officers were near each other when they were hit, with Officer Baker standing behind Officer Rightsell. Similarly, the State conceded at oral argument the possibility that both officers may have been wounded by a single shotgun blast. Defendant, of course, contends that he had only

37

a single intent in firing on the officers and that there was "no evidence that [he] was aware how many people were in the front yard or that he had a differentiated intent towards each one."

{64} However, the evidence also shows that Defendant, in addition to firing his shotgun in the direction of the officers, also fired his pistol at them multiple times. We have previously recognized that the use of more than one firearm supports separate punishments. *See Dominguez*, 2005-NMSC-001, ¶ 24 (holding that the use of two pistols supported multiple convictions for shooting at or from a motor vehicle), *overruled on other grounds by Montoya*, 2013-NMSC-020, ¶ 54. That none of the pistol shots hit the officers does not mean that those shots cannot constitute a separate "overt act in furtherance of and with intent to commit" first-degree murder.

{65} Perhaps most importantly, Defendant fired multiple shots in the direction of at least two potential victims. In fact, the evidence showed that as many as three additional officers were stacked behind Officers Rightsell and Baker when Defendant was firing in their direction. Though no attempted-murder charges were brought with respect to these three other officers, we repeatedly have observed that the number of victims is "a particularly significant indicator in determining whether acts are distinct." *Bernal*, 2006-NMSC-050, ¶ 18 (citing *Herron v. State*, 1991-NMSC-012,

38

¶ 15, 111 N.M. 357, 805 P.2d 624) (holding that the number of victims supported two convictions for robbery); *see also, e.g.*, *Dominguez*, 2005-NMSC-001, ¶ 23 (holding that the number of victims supported two convictions for shooting at or from a motor vehicle), *overruled on other grounds by Montoya*, 2013-NMSC-020, ¶ 54; *State v. Morro*, 1999-NMCA-118, ¶ 19, 127 N.M. 763, 987 P.2d 420 (holding that the number of victims supported ten convictions for defacing a tomb).

{66} We have little difficulty rejecting Defendant's double jeopardy argument in light of this evidence. Using two weapons to fire multiple shots in the direction of an unknown number of officers is sufficient to justify multiple convictions for attempted first-degree murder—particularly when two of the five officers in the line of fire were injured. *Cf. State v. Johnson*, 1985-NMCA-074, ¶ 41, 103 N.M. 364, 707 P.2d 1174 ("We agree with the state that where there is but a single violent act and multiple victims, the societal harm is greater. And, thus, the greater the harm, the greater the need to deter such conduct. To hold otherwise would encourage single-act-multiple-victim type crimes.").

**Issue 7: Defendant's Consecutive Life Sentences are Not Contrary to Statute**

{67} Finally, Defendant challenges the district court's imposition of consecutive (rather than concurrent) life sentences for the murders of Chris and Michelle. He

39

maintains that consecutive life sentences "deprive the Parole Board of its authority to determine whether a prisoner in a particular case meets the criteria for parole after 30 years have been served." He also contends that consecutive life sentences are not permitted because they are indeterminate sentences and result in a sentence with an indeterminate start date.

**{68}** As an initial matter, Defendant makes these assertions without supporting argument or authority. We therefore assume that there is none and deny his challenge to his consecutive life sentences on that basis. *See, e.g.*, *State v. Isiah*, 1989-NMSC-063, ¶ 15, 109 N.M. 21, 781 P.2d 293 ("This court has long held that issues raised in appellate briefs without support by cited authority will not be reviewed by us on appeal."); *see also Elane Photography, LLC v. Willock*, 2013-NMSC-040, ¶ 70, 309 P.3d 40 ("It is of no benefit either to the parties or to future litigants for this Court to promulgate case law based on our own speculation rather than the parties' carefully considered arguments.").

**{69}** Moreover, Defendant's contention that his consecutive life sentences are illegal is without merit. *Cf. State v. Gillihan*, 1970-NMSC-076, ¶ 5, 81 N.M. 535, 469 P.2d 514 (holding that nothing in the a prior version of the Criminal Sentencing Act "prohibit[s] the trial court from exercising [its] judgment and discretion as to whether

40

such substituted [life] sentences should be served consecutively or concurrently"). We long have held that, even for consecutive sentences, a prisoner's parole begins immediately after the prisoner has finished serving his sentence. *See, e.g.*, *Brock v. Sullivan*, 1987-NMSC-013, ¶ 13, 105 N.M. 412, 733 P.2d 860 (holding that the Criminal Sentencing Act "requires that in the case of consecutive sentencing, the parole period of each offense commences immediately after the period of imprisonment for that offense, and such parole time will run concurrently with the running of any subsequent basic sentence then being served.").

**{70}**     Consecutive life sentences are no different. Petitioner will be eligible for parole on his first life sentence after the completion of thirty years of that sentence. *See* NMSA 1978, § 31-21-10 (2009) ("An inmate of an institution who was sentenced to life imprisonment becomes eligible for a parole hearing after the inmate has served thirty years of the sentence."). When, and if, the Parole Board grants him parole on his first sentence, he will begin serving his parole concurrently with the beginning of his second life sentence.

**CONCLUSION**

**{71}**     For the foregoing reasons, we affirm Defendant's convictions in their entirety.

**{72}**     **IT IS SO ORDERED.**

41

_____

**RICHARD C. BOSSON, Justice**


**WE CONCUR:**


_____

**PETRA JIMENEZ MAES, Chief Justice**


_____

**EDWARD L. CHÁVEZ, Justice**


_____

**CHARLES W. DANIELS, Justice**


_____

**BARBARA J. VIGIL, Justice**

42