This decision was not selected for publication in the New Mexico Appellate Reports. Please see Rule 12-405 NMRA for restrictions on the citation of non-precedential dispositions. Please also note that this electronic decision may contain computer-generated errors or other deviations from the official paper version filed by the Supreme Court.

**IN THE SUPREME COURT OF THE STATE OF NEW MEXICO**

**Filing Date:   June 29, 2017**

**STATE OF NEW MEXICO,**

Plaintiff-Appellee,

v.                                                        **NO. S-1-SC-34808**

**ENRIQUE DELEON,**

Defendant-Appellant.

**APPEAL FROM THE DISTRICT COURT OF CURRY COUNTY**
**Teddy L. Hartley, District Judge**

Bennett J. Baur, Chief Public Defender
J.K. Theodosia Johnson, Assistant Appellate Defender
Santa Fe, NM

for Appellant


Hector H. Balderas, Attorney General
Elizabeth Ashton, Assistant Attorney General
Albuquerque, NM

for Appellee

# DECISION

**MAES, Justice.**

{1}     Enrique Deleon (Defendant) murdered Joe Valero (Joe) and his girlfriend Guadalupe Castaneda (Guadalupe) in their backyard. Their four-month-old son Gino and Guadalupe's five-year-old daughter Renee were inside a nearby vehicle at the time of the shooting. Defendant was convicted of two counts of willful and deliberate first-degree murder and two counts of abuse of a child (endangerment). *See* NMSA 1978, § 30-2-1(A)(1); NMSA 1978, § 30-6-1(D)(1). The district court sentenced Defendant to a term of life imprisonment for each of the murder charges and six years' imprisonment for both child abuse convictions and ran all sentences concurrently.

{2}     In his direct appeal, Defendant raises four issues. We affirm his convictions of first-degree murder but reverse the convictions of child abuse. Because Defendant raises no questions of law that New Mexico precedent does not already sufficiently address, we issue this nonprecedential decision pursuant to Rule 12-405(B)(1) NMRA.

## I.     FACTS AND PROCEDURAL HISTORY

{3}     During the afternoon of September 13, 2011, Joe and Guadalupe had a cookout at their home on Prince Street in Clovis. Their  four-month-old son Gino and Guadalupe's five-year-old daughter Renee were also present. Attending the cookout were Joe's brother Frank Valero (Frank), Frank's ex-girlfriend Elizabeth Fain (Elizabeth), and their son Xavier.

{4} Defendant, his girlfriend Shauna Perry (Shauna), and Shauna's son Malachi Perry (Malachi) lived behind Joe and Guadalupe. Joe and Guadalupe invited Shauna and Defendant to the cookout. Shauna was the first to show up at the cookout, and Defendant arrived later. This was the first time Joe and Defendant had met. Defendant, Joe, and Frank left the cookout to get beer. They first stopped at Joe's sister's house to get money for beer, and then all three men drove to a local convenience store to buy an eighteen-pack of Budweiser. Sometime after the three men returned to the cookout, Joe and Defendant got into an argument. It is not clear what the origin of the argument was, but testimony from Frank and Shauna indicates Joe and Defendant were discussing gang affiliations and tattoos.

{5} Joe became angry and punched Defendant in the face, and Defendant fell to the ground. Shauna and Guadalupe intervened to stop the fight, and eventually Defendant got back on his feet. While Guadalupe was trying to help, Defendant "shrugged [Guadalupe] off and hit her with his elbow" and said, "[B]itches should know their place." Joe punched Defendant again, and it appeared Defendant was knocked unconscious.

{6} Shauna testified she couldn't wake Defendant, so she dragged him back to their home. Defendant soon regained consciousness, and Shauna urged Defendant to go to the hospital, but Defendant refused. Defendant noticed he was bleeding from the back of his head, and he went to the bathroom to clean up. Defendant then entered the bedroom, opened the gun safe, and removed some guns and a clip from the gun

2

safe. Shauna continued to urge Defendant to go to the hospital and stood in the doorway to prevent Defendant from exiting the room and to prevent her children from entering the room. Defendant tried to load a magazine into an AR-15 rifle but it did not fit, so he threw the rifle and magazine on the bed. Eventually Defendant told Shauna, "It's not meant to be; it's not worth it," threw the rifle and magazine onto the bed, and exited the bedroom. Shauna placed the guns back in the safe. Shauna begged him not to go back outside. Defendant then exited the house though the kitchen door, and Shauna followed Defendant as he walked to the fence in the backyard.

{7} Shauna testified she did not see Defendant leave the room with a gun. However, Malachi testified he saw Defendant get a handgun from the safe and load it with bullets. Malachi also testified Defendant put the gun in a holster on his belt.

{8} Meanwhile, because of the altercation, Joe and Guadalupe decided to leave their house, and they put their two children inside the vehicle. Frank told Joe he was going home and left by foot down an alley with Elizabeth and his son Xavier.

{9} When Defendant and Shauna returned to Joe's house, Guadalupe and Joe were putting things in the vehicle. Shauna testified that Defendant started to apologize to Joe and Guadalupe. When Joe saw Defendant had a gun he said, "Oh, you have a gun now?" and rushed toward Defendant, jumping a small chicken wire fence separating the two men. Defendant drew the gun from his holster and shot Joe three or four times and Guadalupe once. Shauna testified that it appeared that Joe had something

3

in his hands as he rushed Defendant, although she was not sure what it was, and she was afraid for Defendant. Two photos admitted into evidence at trial show that Joe was holding keys.

{10}    Shauna took the gun from Defendant and ran into her home. Shauna attempted to put the gun back in the safe, but Defendant told her to put the gun where the police could find it, and she put it on the couch in the living room. Defendant then asked Shauna to take her rings off and hit him so it would "look like self-defense." Shauna testified at trial that Guadalupe told her about Joe's violent character and that he became more violent when intoxicated.

{11}    Frank and Elizabeth heard the gunshots, and Frank ran back to the yard with Elizabeth following. Frank saw Guadalupe and Joe on the ground and went first to check on Joe. Frank realized he couldn't help Joe and then went to check on Guadalupe. Guadalupe told Frank, "[H]e shot me." Elizabeth pushed her son Xavier through the window of Joe's home so that he could unlock the front door. Frank told Elizabeth to call 911.

{12}    Edward Sanchez (Edward) lived nearby and he also heard the gunshots. He stayed inside his house for his own safety. Frank went to Edward's house to elicit his help, and Edward went with Frank to check on Joe. As they were walking toward Joe's house, Frank wanted to look for Defendant, but Edward was able to convince Frank they needed to check on Joe and Guadalupe. They returned to the scene, Edward checked Joe for a pulse, and Joe did not have a pulse. At this point,

4

Defendant returned and asked Edward, "[W]hat happened?" and "Dog, is he okay?" Edward said, "No, dog, you killed him." Then Frank proceeded to jump the fence and chase Defendant down and beat him. When the police arrived, Frank had Defendant on the ground beating his head.

{13} Malachi testified that Defendant spoke to him before going back outside and told him to stay inside. After Defendant left the house, Malachi went to the bathroom window and watched Defendant shoot Joe and Guadalupe. Malachi saw Guadalupe standing behind Joe at the time, and she was also shot.

{14} Joe was pronounced dead at the scene. Defendant and Guadalupe were taken to the hospital. Guadalupe died at the hospital the next day.

{15} Defendant was treated by Dr. Carol Marquez, an emergency room physician, and Nurse Kim Bender. Both testified Defendant had a three-centimeter laceration on the back of his head that required seven staples. Defendant received a CT scan of his head, face, and C-spine, which came back normal. Dr. Marquez also testified she did not see any internal head injuries on the scan. Despite the laceration, Dr. Marquez did not find anything in the tests that caused her to believe Defendant had any type of internal head injury or trauma. Dr. Marquez testified that Defendant received a score of 15—the highest possible score—on the Glasgow Coma Scale. Defendant's blood was drawn, tested, and showed a blood-alcohol content (BAC) of .175. Dr. Marquez testified Defendant was intoxicated but he was stable, alert, and she was not concerned about his intoxication. Defendant's speech was not slurred,

5

he knew the year, his name, and that he was in a hospital in Clovis. Defendant was able to dress himself in scrubs, and he walked out of the hospital without any assistance. Both Dr. Marquez and Nurse Bender also testified that Defendant did not remember what happened, but neither ascribed his lack of memory to his being intoxicated. Defendant was discharged at 3:40 a.m. the next day.

{16} Dr. Ian Paul, a forensic pathologist with the Office of the Medical Investigator, testified that Joe had four gunshot wounds, but one was probably caused by a bullet going through his arm and then entering his torso and lodging in his back. Dr. Paul also testified that there was no gunpowder residue on Joe's clothing, so the distance from the gun to Joe was likely greater than two or three feet.

{17} Deputy Sandy Loomis (Loomis) testified at trial as an expert in crime scene reconstruction. Loomis's expert testimony was that Joe was moving away from Defendant when the first shot was fired. As to Guadalupe, Loomis testified that based on the trajectory of bullets found in the house, Defendant would have had to swing the gun after firing at Joe to shoot Guadalupe. Five shell casings were found in the yard. Days later, Frank found a shell casing in the vehicle where Gino and Renee were when the shooting occurred; however, no damage was found in or on the vehicle.

{18} Defendant was convicted on both counts of first-degree murder and both counts of child abuse. The district court sentenced Defendant to a term of life imprisonment for each of the first-degree murder charges (willful and deliberate) and six years'

6

imprisonment for both child abuse charges. *See* § 30-2-1(A)(1); § 30-6-1(D)(1). Defendant appeals directly to this Court in accordance with the New Mexico Constitution. *See* N.M. Const. art. VI, § 2 ("Appeals from a judgment of the district court imposing a sentence of death or life imprisonment shall be taken directly to the supreme court.").

{19}     Defendant raises four issues: (1) the district court erred in not giving an instruction on the inability to form a specific intent due to intoxication, (2) the district court erred in not giving an instruction on self-defense, (3) the jury was improperly prevented from hearing about Joe's reputation as a violent drunk, and (4) there was insufficient evidence to support first-degree murder of Guadalupe and child endangerment of the two children.

**II.     DISCUSSION**

**A.     Jury Instructions**

**1.     Standard of Review**

{20}     "The propriety of jury instructions given or denied is a mixed question of law and fact." *State v. Salazar*, 1997-NMSC-044, ¶ 49, 123 N.M. 778, 945 P.2d 996. We review mixed questions of law and fact de novo. *Id.*  A defendant is allowed "an instruction on a theory of the case where the evidence supports the theory." *Id.* ¶ 50. In considering a defendant's proposed instruction, "[this Court] view[s] the evidence in the light most favorable to the giving of the requested instruction[]." *State v. Boyett*, 2008-NMSC-030, ¶ 12, 144 N.M. 184, 185 P.3d 355 (citation omitted).

**2.      The District Court Did Not Err When It Denied an Instruction on the Inability to Form a Specific Intent Due to Intoxication**

{21}    Defendant argues that because evidence of his blood alcohol level (.175) exists in the record and he was extremely drunk, he was entitled to the jury instruction on voluntary intoxication so that the jury could consider how alcohol impaired his ability to reason and deliberate.  The State first argues that Defendant has not preserved this issue.  However, if this Court finds that the issue was preserved, the State then argues that Defendant was not entitled to a voluntary intoxication instruction because the evidence did not support the instruction and because his theory of the case was based on self-defense and not on voluntary intoxication.

{22}    We first address the preservation issue raised by the State.  The State argues Defendant did not preserve the issue because he failed to object when the district judge refused the intoxication defense instruction.  At the conclusion of the State's case, Defendant tendered an instruction on intoxication and the inability to form the deliberate intention to take away the life of another that followed our Uniform Jury Instruction 14-5110.  *See* UJI 14-5110 NMRA.  At the end of the conference discussing the jury instructions, defense counsel requested that all instructions be given to the jury.  The district court ruled that any tendered instructions that were inconsistent with the court's ruling were denied and wrote "denied" and his initials on the proffered instructions.

{23}    "Ordinarily a defendant may not base a claim of error on instructions he or she

8

requested or to which he or she made no objection." *State v. Sandoval*, 2011-NMSC-022, ¶ 14, 150 N.M. 224, 258 P.3d 1016 (citation omitted). However, there are several cases holding that an oral request for a correct instruction may suffice for the purposes of preservation. *See State v. Jernigan*, 2006-NMSC-003, ¶ 10, 139 N.M. 1, 127 P.3d 537; *State v. Akers*, 2010-NMCA-103, ¶ 21, 149 N.M. 53, 243 P.3d 757; *State v. Hill*, 2001-NMCA-094, ¶ 7, 131 N.M. 195, 34 P.3d 139. In *Jernigan*, this Court stated the purpose of the preservation requirement is to "alert the trial court to the defendant's argument." 2006-NMSC-003, ¶ 10.

{24} Although defense counsel did not specifically present argument to the district court as to why the intoxication instruction should be given, the district judge must have known defense counsel was requesting it because he wrote "denied" on the tendered instruction. Accordingly, this issue was preserved. Our review is de novo whether there was evidence to support an instruction on intoxication as a defense. *State v. Romero*, 1998-NMCA-057, ¶ 22, 125 N.M. 161, 958 P.2d 119.

{25} To be entitled to a voluntary intoxication instruction, a "defendant must present evidence that (1) he or she consumed intoxicants, (2) he or she was actually intoxicated, and (3) the degree of intoxication interfered with his or her ability to develop the requisite intent to commit the charged crime." *State v. Arrendondo*, 2012-NMSC-013, ¶ 43, 278 P.3d 517. "Merely demonstrating that a defendant consumed alcohol or other intoxicants is inadequate." *State v. Garcia*, 2011-NMSC-003, ¶ 35, 149 N.M. 185, 246 P.3d 1057. "There must be evidence supporting the

9

conclusion that the defendant was actually intoxicated." *Id.* ¶ 35. In viewing the evidence of intoxication, "the trial court must not weigh the evidence, but must simply determine whether such evidence exists." *State v. Privett*, 1986-NMSC-025, ¶ 20, 104 N.M. 79, 717 P.2d 55.

{26} Citing *Privett*, Defendant argues that because Privett had a similar blood alcohol level (.18) to him and the *Privett* court stated no expert testimony regarding intoxication is required, this Court should find the district judge erred in not allowing the instruction. However, in that case there was more evidence than Privett's BAC. The jury also heard testimony regarding Privett's long-term alcoholism, and a sheriff testified that Privett "had a strong odor of alcohol on his breath and appeared 'strongly intoxicated.' " 1986-NMSC-025, ¶ 11. Testimony was also presented that Privett's "conduct and emotional responses in the presence of witnesses . . . ranged from inappropriate to bizarre." *Id.* ¶ 16. Our holding was that to entitle defendant to a voluntary intoxication instruction, the record must contain evidence that defendant "consumed an intoxicant and the intoxicant affected his mental state at or near the time of the crime." *Id.* ¶ 20.

{27} That was not the case here. The only evidence presented concerning Defendant's intoxication was that he had a relatively high BAC (.175) when tested at the hospital. There was no testimony that Defendant displayed any of the typical signs of intoxication such as slurred speech, unsteadiness, or the odor of alcohol on his breath. Moreover, the testimony showed that both before and after the shooting,

10

Defendant had the presence of mind to clean his head wound, go to his gun safe and load a handgun, speak to his girlfriend and son, and ask his girlfriend to punch him after the shooting so it looked like self-defense. While Dr. Marquez testified Defendant was intoxicated, she had no concerns about his intoxication. And both Dr. Marquez and Nurse Bender also testified that Defendant did not remember what happened, but neither ascribed his lack of memory to his being intoxicated.

{28}     Because there was insufficient evidence to support the argument that Defendant was intoxicated to such a degree that he was unable to form the intent necessary to commit first-degree murder, Defendant was not entitled to an instruction on voluntary intoxication. Accordingly, the district judge did not err when it denied Defendant's tendered instruction on the inability to form a specific intent due to intoxication.

**3.     The District Court Did Not Err When It Denied an Instruction on Self-Defense**

{29}     Defendant proffered jury instructions on self-defense and defense of another. *See* UJI 14-5171 NMRA; UJI 14-5172 NMRA. In addition, Defendant requested instructions explaining that an assailed person need not retreat and on the issue of whether Joe was the first aggressor. *See* UJI 14-5190 NMRA; UJI 14-5191 NMRA. These instructions were discussed and then denied by the district judge, who stated, "There's no self-defense facts in this case."

{30}     Before an instruction on self-defense can be given, the district court must first find evidence of three essential elements: "(1) an appearance of immediate danger of

11

death or great bodily harm to the defendant, (2) the defendant was in fact put in fear by the apparent danger, and (3) a reasonable person in the same circumstances would have reacted similarly." *State v. Lucero*, 1998-NMSC-044, ¶ 6, 126 N.M. 552, 972 P.2d 1143 (citation omitted). "[E]vidence must be sufficient to allow reasonable minds to differ regarding all elements of the defense." *State v. Swick*, 2012-NMSC-018, ¶ 60, 279 P.3d 747.

{31} Defendant argues that sufficient evidence was presented to fulfill all three requirements of a self-defense instruction. As to the first two elements of self-defense, Defendant points to testimony from trial that Defendant "saw Joe come toward him and [Shauna] with something shiny in his left hand while taunting him, 'Oh, you have [a] gun now?' " This was after Joe had beaten Defendant unconscious a short time before. Defendant concludes that because of the appearance of something in Joe's hand and his apparent lunging at Defendant, he had reason to fear Joe and to believe Joe would "stab him or [Shauna]" and that Joe's death was a result of that fear. As to the last element, whether Defendant's response was reasonable, Defendant argues this is a matter for the jury (citing *State v. Johnson*, 1998-NMCA-019, ¶ 16, 124 N.M. 647, 954 P.2d 79.)

{32} The State argues there was not sufficient evidence to support a self-defense instruction by asserting Defendant was not in immediate fear of his life because he "was the instigator," as he was beaten by Joe, went home to arm himself, and returned to "continue the dispute." Citing *Lucero*, the State argues that by returning to a

12

dispute after retrieving a weapon, Defendant became a first aggressor. 1998-NMSC-044, ¶ 9.

{33} We addressed the issue of first aggressor in *State v. Chavez*, 1983-NMSC-037, 99 N.M. 609, 661 P.2d 887, and in *Lucero*, 1998-NMSC-044. The defendant in *Chavez* was a first aggressor when he entered a convenience store with a knife intending to rob the store and subsequently stabbed and killed a patron who tried to stop the robbery. 1983-NMSC-037, ¶ 6. We held that it is "well established in this jurisdiction that a defendant who provokes an encounter, as a result of which he finds it necessary to use deadly force to defend himself, is guilty of an unlawful homicide and cannot avail himself of the claim that he was acting in self-defense." *Id.* However, we clarified in *Lucero* that if the defendant was an aggressor or instigator of the conflict, a self-defense instruction is available only if "[t]he defendant was using force which would not ordinarily create a substantial risk of death or great bodily harm; and . . . victim responded with force which would ordinarily create a substantial risk of death or great bodily harm." 1998-NMSC-044 ¶ 7 (internal punctuation and citation omitted). In *Lucero*, the defendant followed his victims, with whom he had an earlier confrontation that day, to a vacant lot and fired into the air. 1998-NMSC-044, ¶ 8. The victims fired back creating an ensuing gun battle in which two people were killed. *Id.* ¶ 4. We held that "[b]efore [defendant] drew his gun, there was no appearance of immediate danger of death or great bodily harm to him by [victim]" because the previous encounters between victim and defendant had

13

ended. Therefore, these previous encounters were unavailable as evidence of the immediate danger to defendant and he was not entitled to a self-defense instruction. *Id.* ¶ 8.

{34} In this case, the evidence most favorable to support an instruction of self-defense was the following;

1. Defendant was assaulted by Joe and knocked unconscious.
2. Defendant went home but returned to speak to Joe about the fight.
3. Joe saw Defendant had a gun and said, "Oh, you have a gun now?" and Joe moved toward Defendant and had something in his hands.
4. Character evidence that Joe was violent and became more violent when intoxicated.

This evidence could support the first element that Defendant was in fear of an apparent danger of immediate death or great bodily harm when he shot Joe. Even this, however, is generous as it is speculative whether Joe posed an apparent danger of immediate death or great bodily harm. But we will assume that because Defendant had been knocked unconscious in the previous incident, it was reasonable to fear it could happen again. Nevertheless, the third element of the jury instruction requires that Defendant acted reasonably when he killed.

{35} It is clear Defendant was the victim when Joe punched him and knocked him unconscious. At that point, Defendant had the right to defend himself. However, Defendant returned to his home, cleaned himself up, got a handgun and loaded it, spoke to Shauna and his son, and then went back to confront Joe. After he shot Joe

14

and Guadalupe, he returned home and asked Shauna to punch him so it would look like self-defense. To use the language of *Chavez*, because it was Defendant who "provoke[d] [the] encounter" and "as a result . . . [found] it necessary to use deadly force to defend himself," he cannot avail himself of the claim that he was acting in self-defense. 1983-NMSC-037, ¶ 6. After the initial altercation, Joe posed no threat to Defendant and was leaving the scene when Defendant returned. We cannot say Defendant acted reasonably in this case.

{36} It could be argued that Defendant was showing concern for Joe's well-being when he went back to the scene and asked Edward Sanchez, "[I]s he okay?" But even this generous inference is beyond the pale of reasonableness. To say that Defendant was entitled to a self-defense instruction in this case would be to say that after a fistfight, it is lawful to retreat to one's home and get a loaded gun to use when returning to confront the initial attacker.

{37} Defendant did not act reasonably when he shot Joe and Guadalupe and was therefore not entitled to the self-defense instruction. Accordingly, the district court did not err when it denied the instruction on self-defense because Defendant was the aggressor when he used a gun.

**B. The District Court Did Not Abuse Its Discretion When It Excluded Evidence of Joe's Reputation as a Violent Drunk**

{38} Defendant argues he was improperly precluded from presenting evidence of Joe's violent character. Defendant contends he sought to elicit testimony from both

15

Shauna and Loomis to support his claim of self-defense. Defendant states it was "critical for the jury to know that Joe's reputation was such that [Defendant] could believe he and [Shauna] were in imminent danger and likely that Joe instigated the deadly conflict." The State argues that the district court was correct in limiting Defendant's presentation of evidence because evidence showing the victim was a first aggressor is limited to reputation and opinion evidence only.

{39} The exclusion of evidence falls within the discretion of the district court. *State v. Baca*, 1997-NMSC-045, ¶ 22, 124 N.M. 55, 946 P.2d 1066. An abuse of discretion arises when the evidentiary ruling is clearly contrary to logic and the facts and circumstances of the case. *State v. Maples*, 2013-NMCA-052, ¶ 13, 300 P.3d 749. "An evidentiary ruling within the discretion of the court will constitute reversible error only upon a showing of an abuse of discretion and a demonstration that the error was prejudicial rather than harmless." *State v. Smith*, 2016-NMSC-007, ¶ 46, 367 P.3d 420 (citation omitted).

{40} Character evidence is generally "not admissible to prove that on a particular occasion the person acted in accordance with the character." Rule 11-404(A)(1) NMRA. But in criminal cases, Rule 11-404(A)(2)(b) NMRA allows a defendant to offer evidence of a victim's pertinent character or character trait. There are two basic methods by which a party may prove character. *See* Rule 11-405 NMRA. First, character "may be proved by testimony about the person's reputation or by testimony in the form of opinion." Rule 11-405(A). Second, when a defendant is claiming self-

16

defense, the victim's character may be proved by "relevant specific instances of conduct" to show the defendant's fear of a victim. Rule 11-405(B). While admissible for purposes of establishing self-defense, "evidence of specific instances of a victim's prior violent conduct may not be admitted to show that the victim was the first aggressor." *State v. Armendariz*, 2006-NMSC-036, ¶ 17, 140 N.M. 182, 141 P.3d 749, *overruled on other grounds by Swick*, 2012-NMSC-018. On the other hand, a defendant may show the victim was the first aggressor with evidence of reputation or opinion, but as a condition of admissibility, the defendant must have been aware of that reputation or opinion. *See Armendariz*, 2006-NMSC-036, ¶ 17.

{41}    With respect to the evidence to be elicited from Shauna, Defendant contends that for purposes of showing his fear of Joe was reasonable, Shauna "was prepared to testify that she told [Defendant] that Joe was a mean, violent drunk." That testimony would have been essential because as an element of his defense, Defendant was required to establish he was aware of Joe's prior violent conduct so as to show he reasonably feared Joe. But despite Defendant's claim to the contrary, he actually elicited some testimony from Shauna concerning Joe's violent character.

{42}    The following exchange is illustrative:

Q:    Did Joe seem threatening when he was coming over the fence?

A:    Yes.

Q:    Isn't it a fact that [Guadalupe] indicated to you through her words or actions that Joe was a violent person?

17

A: Yes.

Q: Did [Guadalupe] ever indicate to you through words or actions that Joe became more violent when he was intoxicated?

A: Yes.

{43} While Defendant did introduce some evidence of Joe's pertinent character trait, with respect to the more specific question of whether Shauna would have said she had told Defendant about Joe's violent character, a review of the record indicates the testimony was never elicited and Defendant made no offer of proof. That omission alone suggests Defendant failed to preserve the issue for our review. *See generally* Rule 11-103(A)(2) NMRA (requiring a party to make an offer of proof in order to preserve error concerning the exclusion of evidence). The lack of an adequate record prevents us from evaluating the merits of Defendant's claim of error with respect to other potential testimony from Shauna on appeal. *See, e.g.*, *State v. Mark Vincent Garcia*, 1983-NMCA-069, ¶ 7, 100 N.M. 120, 666 P.2d 1267 (applying Rule 11-103(A)(2) NMRA and concluding that the defendant failed to make an offer of proof necessary to preserve the issue of whether the district court properly excluded testimony).

{44} Moreover, there was no evidence presented that Joe was intoxicated. There was testimony that he drank beer before the incident, and photos of the scene show many beer bottles, but no evidence was presented regarding his conduct or behavior or any other evidence of intoxication. And without some additional evidence of

18

intoxication, any testimony from Shauna regarding Joe's violent behavior when intoxicated would have been without adequate foundation. Because the proper foundation had not been laid for that portion of Shauna's testimony, the potential character evidence would not have satisfied the basic relevancy requirement. *Cf. State v. Herrera*, 1978-NMCA-048, ¶ 32, 92 N.M. 7, 582 P.2d 384 ("Since, however, the trait of character must be 'pertinent' the question of relevance remains."). Given the failure to preserve error with respect to Shauna's testimony and the lack of foundation, we find no abuse of discretion by the district court as to Shauna's testimony.

{45}    Defendant also argues that he was prevented from eliciting testimony from Loomis regarding his opinion of Joe and Joe's reputation for being a violent drunk. Defendant asserts that through Loomis's previous encounters with Joe, Loomis "had formed an opinion of Joe and knew that Joe had a reputation of being a violent mean drunk." On direct examination, Loomis testified he knew Joe. Before Loomis was cross-examined, the State lodged a general objection requesting that defense counsel be precluded from asking about Loomis's previous encounters with Joe. The State cited Rule 11-403 and 11-404(B) in support. The district court granted the request, ordering that defense counsel avoid any questions about Loomis's previous encounters with Joe because that would constitute inappropriate introduction of character evidence. The district court also explained that "under the facts of this case, [Joe's] character is not at issue." Given that sequence, we address two issues: (1) the

19

exclusion of testimony regarding past encounters between Loomis and Joe, and (2) the exclusion of Loomis's opinion of Joe and Joe's reputation in the community.

{46} The first issue is easily disposed of because specific instances of a victim's violent conduct may only be introduced to show the defendant's subjective fear of the victim if it is established that the defendant knew of the victim's past violent acts at the time of the incident. *Maples*, 2013-NMCA-052, ¶ 18. But there was no evidence presented establishing that Defendant knew of Joe's past violent acts at the time of the incident. And in addition, as stated above, evidence of the victim's prior violent conduct is not admissible to show the victim was the first aggressor when a defendant is claiming self-defense, as was the case here. *Armendariz*, 2006-NMSC-036, ¶ 17. It was therefore proper for the district court to exclude this testimony.

{47} The second issue is more problematic, as the defense may present reputation or opinion evidence to show the victim was the first aggressor. *Maples*, 2013-NMCA-052, ¶ 17. And importantly, the defense need not show the defendant knew of the victim's reputation for purposes of establishing the victim was the first aggressor. *Id*. ¶ 18. While the district court ruled that Defendant could not elicit testimony regarding Loomis's past encounters with Joe, the court made no ruling to prevent Defendant from eliciting more general opinion or reputation testimony. Although Defendant stated that Loomis "had formed an opinion of Joe and knew that Joe had a reputation of being a violent mean drunk," he failed to make an offer of proof, and he failed to ask Loomis any questions regarding his opinion of Joe or Joe's

reputation. Therefore, for the sake of completeness, even in the absence of an offer of proof, we will assume Loomis would have testified that in his opinion Joe was violent and he had a reputation for violence. That would have been a proper use of character evidence and the testimony would have been, as a general proposition, admissible under Rule 11-404(A)(2)(b).

{48} But our review also requires that we address whether exclusion in that scenario would have been sufficiently prejudicial to Defendant so as to constitute harmful error. *State v. Campbell*, 2007-NMCA-051, ¶ 13, 141 N.M 543, 157 P.3d 722. In other words, "[a] defendant seeking relief because an avenue for his defense was foreclosed by an evidentiary ruling must show that he was prejudiced by the ruling." *Id.* ¶14 (citation omitted). But "[n]o more prejudice need be shown than that the trial court's order may have made a potential avenue of defense unavailable to the defendant." *Id.* ¶ 14 (quoting *State v. Orona*, 1979-NMSC-011, ¶ 8, 92 N.M. 450, 589 P.2d 1041).

{49} The prejudice inquiry is telling because even without the Loomis testimony, Defendant was able to support his self-defense theory based on various portions of the record. Shauna, for example, testified about Joe's violent character and his demeanor before the shooting. And the jury could have inferred Joe was prone to violence, given his assault of Defendant prior to the shooting. That evidence adequately supported Defendant's claims that he was in fear of Joe when he shot him and that Joe was the first aggressor, and thus Defendant was given adequate

21

opportunity to present the defense to the jury. Accordingly, the exclusion of Loomis's testimony about Joe's character was not sufficiently prejudicial as to constitute harmful error.

**C. There Was Sufficient Evidence to Support First-Degree Murder of Guadalupe; There Was Insufficient Evidence to Support Child Endangerment**

**1. Murder of Guadalupe**

{50} Defendant argues there was insufficient evidence to establish that he killed Guadalupe deliberately, that her shooting was accidental, and that the State recognized this by submitting an instruction on transferred intent that was later withdrawn. The State asserts deliberate intent was shown at trial by evidence that Defendant swung his gun in Guadalupe's direction to shoot her.

{51} We review the evidence to determine whether there was "substantial evidence . . . to support a verdict of guilt beyond a reasonable doubt with respect to every element essential to a conviction." *State v. Duran*, 2006-NMSC-035, ¶ 5, 140 N.M. 94, 140 P.3d 515 (citation omitted). "[W]e resolve all disputed facts in favor of the State, indulge all reasonable inferences in support of the verdict, and disregard all evidence and inferences to the contrary." *State v. Smith*, 2016-NMSC-007, ¶ 19 (citation omitted).

{52} The jury was instructed that to find Defendant guilty of first-degree murder by a deliberate killing, it must find each of the following: (1) Defendant killed

22

Guadalupe, (2) the killing was with deliberate intention to take away the life of Guadalupe or any other human being, and (3) this killing happened in New Mexico on or about September 13, 2011. There is no question that Defendant shot and killed Guadalupe. We need only address the second element: that Defendant committed the killing with the deliberate intent to kill that distinguishes first-degree murder from second-degree murder.

{53} "Deliberate intent may be inferred from the particular circumstances of killing as proved by the State through the presentation of physical evidence." *Duran*, 2006-NMSC-035, ¶ 8. A jury may draw inferences of deliberation from evidence of "earlier confrontation[s] . . . or other common areas of friction leading to violence," *State v. Tafoya*, 2012-NMSC-030, ¶ 52, 285 P.3d 604, or fleeing the scene, disposing of evidence, or concocting false alibis. *See State v. Flores*, 2010-NMSC-002, ¶ 22, 147 N.M. 542, 226 P.3d 641. The jury can also use the defendant's actions after a killing to aid them in finding deliberate intent. *See State v. Astorga*, 2015-NMSC-007, ¶ 65, 343 P.3d 1245.

{54} We first address Defendant's argument that it was error to include the phrase "any other human being" in the jury instruction. Defendant claims this was a partial instruction on transferred intent, but because the instruction on transferred intent was not given, it was error to include the phrase. Defendant concedes he intended to kill Joe, but absent a finding of transferred intent, contends he could not have formed the requisite intent regarding Guadalupe.

23

{55} In *State v. Fekete*, we stated that in some instances the phrase "or any other human being" may assist the jury and its use is not limited only to cases involving transferred intent. 1995-NMSC-049, ¶ 25-26, 120 N.M. 290, 901 P.2d 708. This is because New Mexico's deliberate intent murder statute provides that first-degree murder is the "killing of one human being by another." *Id.* ¶ 23 (quoting Section 30-2-1(A)). It is only necessary to find beyond a reasonable doubt that a defendant had the intent to kill a human being, not a specific named person. Therefore, the State only had to prove Defendant had the intent to kill when he shot Guadalupe, not that he intended to kill Guadalupe specifically. Often it is the case that a defendant will intend to kill a specific person, but this is not the specific intent necessary for first-degree murder. *See State v. Vega*, 2014 WL 72581, ¶ 28, No. 33,363, dec. ¶ 13 (N.M. Sup. Ct. Jan. 9, 2014) (non-precedential) ("[T]he deliberate intent to kill 'someone,' followed by the deliberately intentional killing of the victim satisfied the requirements of first-degree murder irrespective of any theory of transferred intent."). Therefore, it was not error to include the phrase, "any other human being" in the jury instruction.

{56} The evidence of deliberation included:

1. Loomis testified that in his expert opinion the shooter would have had to swing his arm to shoot Guadalupe after shooting Joe.
2. Joe's body and Guadalupe were not right next to each other when officers arrived.
3. Before the shooting, there was friction between Defendant and Guadalupe when she tried to help Defendant after he was knocked

24

down.

4. Guadalupe said, "[H]e shot me."

5. Defendant asked Shauna to punch him so it looked like self-defense and returned to the scene and asked, "What happened?" and "[I]s he okay?"

{57} Defendant's contention that the shooting was accidental does not make the evidence presented against him insufficient. "The jury heard evidence regarding the [d]efendant's version of the facts and was free to reject that testimony." *Salazar*, 1997-NMSC-044, ¶ 46, 123 N.M. 778, 945 P.2d 996.

{58} Viewing the evidence in the light most favorable to the verdict, a rational jury could have found beyond a reasonable doubt that Defendant killed Guadalupe with deliberate intent and intended to hide the fact by creating a self-defense narrative. Accordingly, there was sufficient evidence to convict Defendant of first-degree murder and affirm the jury's verdict.

**2. Child Endangerment of Gino and Renee**

{59} Defendant argues there was not sufficient evidence to support a conviction for child endangerment because Defendant was not aware of where the children were when the shooting occurred. Defendant asserts Gino and Renee were not in the zone of danger created by Defendant's conduct. In addition, Defendant argues the bullet found in the vehicle did not match Defendant's gun.

{60} The State asserts the evidence was sufficient, arguing Defendant should have known Gino and Renee were in the vehicle because Defendant shot into the backyard

and home, a bullet was found in the victim's vehicle where the children were placed, and they were playing among the other adults at the barbeque.

{61}    At trial, the State had the burden to prove (1) Defendant caused Gino and Renee to be placed in a situation which endangered their lives or health, (2) Defendant acted intentionally or with reckless disregard and without justification; he knew or should have known his conduct created a substantial and foreseeable risk and disregarded that risk, (3) Gino and Renee were under the age of 18, and (4) the incident happened in New Mexico on or about September 13, 2011. Only the second element is in dispute. *See* UJI 14-604 (2013) NMRA.

{62}    In *Arrendondo*, we explained that a showing the defendant should have known that his conduct created a substantial risk can be made with "evidence that the defendant was or should have been aware that the child was present within the zone of danger." 2012-NMSC-013, ¶ 25, (citation omitted). We also stated that the "criminal negligence 'mental state requires that [d]efendant know, or at least should know, that her conduct is endangering a child.' " *Id.* ¶ 25 (quoting *State v. Gonzales*, 2011-NMCA-081, ¶30, 150 N.M. 494, 263 P.3d 271).

{63}    In *Arrendondo*, we found sufficient evidence that the defendant should have known that one of the children was in the house into which he shot. 2012-NMSC-013, ¶¶ 27-28. We relied on evidence presented at trial that the defendant was told "before the shooting that there was a 'newborn baby' in the house." *Id.* ¶ 27. That information "would allow a reasonable jury to have found that [the defendant] knew

26

or should have known that his conduct created a substantial risk to [a newborn baby], who was approximately three weeks old at the time of the shooting." *Id.* In contrast, we held there was insufficient evidence to support a conviction for abuse of a second child in the house because we found no evidence in the record that the defendant knew or should have known the second child was in the house. *Id.* ¶ 28.

{64}   While Defendant should have known the children were in the backyard at the time of the initial altercation, he had no reason to know that the children were in the vehicle after the fight. Defendant left the backyard with his girlfriend. Then Joe and Guadalupe began packing their things up and loaded their children into the vehicle. Defendant was not present during this process. When he returned, he would not have seen any children in the immediate vicinity. Similar to the defendant in *Arrendondo* with respect to the second child in the home in that case, Defendant here had no knowledge the children were in the vehicle. Moreover, the bullet eventually found in the vehicle in which the children had been placed did not match Defendant's gun; it was found by the victim's brother days after the shooting, and it was revealed the vehicle had incurred no damage from a bullet. Without a bullet from Defendant's gun in the vehicle or any other evidence linking the vehicle to the zone of danger, the record cannot support a conclusion the vehicle was a part of the zone of danger. Accordingly, the State has not presented evidence sufficient to warrant a conviction on child endangerment in this case. Therefore, we reverse both child endangerment convictions.

**III.    CONCLUSION**

{65}    For the reasons outlined above we affirm the first-degree murder convictions as to Joe and Guadalupe and reverse both child endangerment convictions.

{66}    **IT IS SO ORDERED.**


_____
**PETRA JIMENEZ MAES, Justice**

**WE CONCUR:**


_____
**JUDITH K. NAKAMURA, Chief Justice**


_____
**EDWARD L. CHÁVEZ, Justice**


_____
**CHARLES W. DANIELS, Justice**


_____
**BARBARA J. VIGIL, Justice**

28